STATE EX REL. E. W. DECKER v. JAMES E. MONTAGUE AND ANOTHER.[1]

October 18, 1935.

No. 30,595.

[1]Reported in 262 N. W. 684.

Stinchfield, Mackall, Crounse, McNally & Moore, Clyde W. Fiddes, Cobb, Hoke, Benson, Krause & Faegre, G. Aaron Youngquist, and Matthew Murphy, for relator.

Harry H. Peterson, Attorney General, and Roger S. Rutchick, Assistant Attorney General, for respondents.

JULIUS J. OLSON, JUSTICE.

Relator has sued out of this court an alternative writ of prohibition, the relief sought being to prevent respondent Montague, one

of the district judges of the fourteenth judicial district, appointed by the governor under an executive order, from acting in the place of the regularly elected, qualified, and acting district judges of the seventh judicial district. The basis for the present proceeding may be stated thus: On November 19, 1934, an information was filed in the district court of Clay county, seventh judicial district, charging relator and 16 others with grand larceny in the second degree. The defendants were arraigned shortly thereafter, and each entered a separate plea of not guilty. Their demands for separate trials were granted. The state moved the trial of one Thomson at that term. In his behalf only an affidavit of prejudice was filed against the then presiding judge. No other affidavit of prejudice has ever been filed against any of the judges of that district. On December 7, 1934, the governor signed an executive order designating Judge Montague of the fourteenth judicial district to try that case and also the other cases pending against the other defendants. That case was duly heard and resulted in a verdict of acquittal.

Shortly prior to the commencement of the succeeding April, 1935, general term of court in that county the senior judge thereof, the Honorable Carroll A. Nye, duly filed an order assigning Judge Cameron of that district to preside thereat. Pursuant to that order Judge Cameron served during that term. The action against this relator was then pending on the calendar of that court. The case had not been brought on for trial because the state had not so moved. There was no disability on the part of Judge Cameron, nor was there any congestion of the court calendar. As a matter of fact, because of lack of further business, the judge on May 1, 1935, ordered a recess until May 13. When court reconvened pursuant to that adjournment the state announced that it would move the trial of relator's case to begin on or about June 5, 1935; also, that it would move that the case be brought for trial before Judge Montague pursuant to the original executive order filed in the Thomson case at the previous term. Thereupon relator made and entered upon the record his objection to the trial of his case before Judge Montague, insisting that the case be brought for trial and be heard and determined in the ordinary course of procedure before

the then sitting judge. Judge Cameron duly heard relator's objection and after full consideration on May 28 filed an order sustaining the same. Judge Cameron held that the executive order filed at the previous term in the other case was not intended to, nor could it constitutionally, operate as an assignment of the Decker case before Judge Montague at a subsequent term. The order further recited that the cause "should be tried according to the rules of procedure which apply to the trial of all criminal actions, unless the parties by agreement consent to depart from such usual course"; also stating that there existed "no reason why the judges of this district cannot legally try the case." In the same order the judge stated that if there were no objections made it would be entirely agreeable to him that Judge Montague act, as he had the benefit of the experience gained from the trial of the Thomson case and that thereby he might be better able to expedite the trial in the instant case. No appeal or other proceeding has been had to review that order. Later the state announced to the court that it would not be ready for trial on June 5 and asked and obtained a continuance until a later date could be determined upon. Thereupon counsel for the state procured from the governor another executive order, and again Judge Montague was designated by him to try the case. This second executive order was filed June 5. Judge Montague indicated his intention to comply with the last named executive order and that he would fix a date for the trial thereof. Thereupon relator commenced these proceedings for a writ of prohibition.

Counsel have ably presented many questions for our consideration and determination. The view we take of the case, however, makes it unnecessary to consider any other issue than that presented by the purpose and meaning of 1 Mason Minn. St. 1927, § 158. So the question to be considered and here determined is really this: Does § 158 on the facts before the court authorize the executive designation of a substitute judge in this case?

The governor's authority to assign a judge of one district to act in the place of the judge of another district appears in the first revision of the Territorial Laws, R. S. 1851, c. 69, art. II, § 8, which reads:

"In case any judge of a district court from sickness, or any other cause, shall be unable to hold any of his courts, or in case any vacancy shall occur in any of the districts, the clerk thereof shall in due time give notice of such fact to the governor, who shall assign to one of the other district judges to hold the court or courts, in such district, until the inability of the judge shall be removed, or the vacancy filled."

The same provision is found in Public Laws, 1849-1858, c. 57, (6) § VIII. The official revision of 1866, c. 64, § 8, made a slight change so that as then amended it was provided:

"In case any judge of a district court, from sickness or any other cause is unable to hold any of his courts, the clerk thereof shall in due time give notice of such fact to the governor, who shall assign to one of the other district judges to hold the courts in such district, until the inability of the judge is removed."

Note here should be made that the governor's authority throughout was limited to cases of actual disability of the sitting or regular judge. The same provision was incorporated in G. S. 1878, c. 64, § 8. During all of this time and concurrently there were enacted statutes providing for assignment of substitute judges for judges disqualified by interest, but the authority to make such assignment was placed in the judges themselves. This statutory provision appears first in L. 1858, c. 67, § 3. It was reënacted with some amendments in substantially the same form in L. 1863, c. 42, R. S. 1866, c. 64, § 5, and G. S. 1878, c. 64, § 5. In L. 1891, c. 77, the governor's authority to designate a substitute for a judge disabled by sickness or the accumulation of business was expanded so as to include cases wherein the resident judge was disqualified by interest. This amended provision remained unchanged and appears in G. S. 1894 as § 4839. Here, too, it will be noted that the governor's authority to designate a substitute judge is conditioned upon (1) the disqualification of the resident judge, or (2) actual disability of the resident judge to dispose of the pending cases without unreasonable delay. The original provision for executive designation of a substitute judge, dating back to 1851, was retained

separately in substantially its original form as G. S. 1894, § 4843. Throughout all these years the designation of a substitute judge remained limited to cases where the regular judge was actually disabled from holding his court.

The important question therefore becomes, what change, if any, occurred in the 1905 Revision where the two sections from G. S. 1894 were incorporated into one, R. L. 1905, § 94? When the revisers were recasting §§ 4843 and 4839 into one section they omitted § 4839 and inserted in lieu thereof "whenever * * * the convenience or interest of the public for any reason shall require it." Does this change indicate an intention to change the then existing law? The statement of the revisers having in hand the writing of the 1905 Revision is not only interesting but we think controlling. In their report, 2 Mason Minn. St. 1927, pp. 2145-2146, they say:

"The acts under which we have proceeded required the revisers to examine and compare the existing general laws in force, together with the judicial interpretation and construction thereof, and to prepare and recommend such revision and codification thereof as should 'in their opinion simplify, harmonize, and complete said public statutes.' Obviously the codification here referred to is not a codification in the sense in which the term is used in the so-called code states, but only a rearrangement of the existing statutes in a more compact and convenient form—not a legislative enactment of the rules of law in general, but a restatement of the existing statute law."

And further:

"The compression of the substance of this vast accumulation within manageable limits has required the rewriting of nearly every section. The purpose kept constantly in mind has been to present the existing statutory system with such changes only as seemed necessary to make it more simple, consistent, and effective."

It is highly significant that in the revisers' comments pertaining to c. 5 (which includes § 94 here involved) nothing at all was said to indicate that the change in wording was intended to work any

substantial change in the former statute. They say, "wherever material additions to the law are proposed, the word 'New' has generally been appended to the section." Nothing indicating that anything new was intended appears or was appended to § 94. Later in their report they carefully point out:

"It should be distinctly understood that changes in language do not necessarily indicate an intention to change the meaning of the law. Superfluities and contradictions could not be eliminated without changes in the forms of expression. It is a well-settled rule of statutory construction 'that in the revision of statutes neither an alteration in phraseology, nor the omission or addition of words, in the latter statute, shall be held necessarily to alter the construction of the former act.' "

So we find that it is a generally accepted rule of statutory construction that a revision of existing statutes is presumed not to have changed their meaning, even if there be phraseological alterations, *unless an intention to change clearly appears from the language of the revised statute when considered in connection with the subject matter of the act and its legislative history.* (Italics ours.) 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 8961. This rule was applied in Firehammer v. Interstate Sec. Co. 170 Minn. 475, 212 N. W. 911; and in Wipperman Merc. Co. v. Jacobson, 133 Minn. 326, 158 N. W. 606, 608, the court went back to the origin of the statute in the Laws of 1860 and reviewed all subsequent enactments pertaining thereto, pointing out that no substantial change had been made during a period of something over 40 years. The 1905 Revision introduced a change in wording, but the court had no trouble in holding that such change did not affect, nor was it intended to affect, the original enactments, the court saying, 133 Minn. 332:

"The presumption is that no change in the existing law was intended by the revision and to give it effect as changing the former law, the intention to make such change must clearly appear from the language of the statute when taken in connection with the history of the act and the purpose sought to be accomplished by it."

The following cases accord therewith: State v. Ledbeter, 111 Minn. 110, 126 N. W. 477; United States & C. L. Co. v. Sullivan, 113 Minn. 27, 128 N. W. 1112, Ann. Cas. 1912A, 51; Lockey v. Lockey, 112 Minn. 512, 128 N. W. 833; State ex rel. Sherping v. Schmahl, 118 Minn. 319, 136 N. W. 870; Manson v. Village of Chisholm, 142 Minn. 94, 170 N. W. 924; Olson v. Oneida Mines Co. 153 Minn. 80, 189 N. W. 455.

The power of the legislature to provide that a judge elected and serving in one district may be called upon to render service in a district not his own is based upon art. 6, § 5, of our constitution, which reads:

"The legislature may provide by law that the judge of one district may discharge the duties of the judge of any other district not his own, when convenience or the public interest may require it."

1 Mason Minn. St. 1927, § 158, provides:

"Whenever in the judgment of the governor, or of any judge of any judicial district, the convenience or interest of the public or the interest of any litigant shall require that the judge of another judicial district shall discharge any of the duties of such judge, the governor may designate, or such judge may request, a judge of the district court of any other judicial district to discharge any such duties; to hold, or to assist in holding a general or special term of such court, in any county of such judicial district other than his own, or to try and determine any motion, action or proceeding pending therein. And thereupon such judge of the district court, or any other judicial district so designated or requested, may discharge any such duties, hold or assist in holding a general or special term of such court, or try and determine any motion, action or proceeding pending therein. And by consent of the parties any judge of said court may act in all matters brought before him from another judicial district. In either case the acts, orders and judgments of the judge so acting shall have the same force and effect as though given by a judge of such judicial district. When no other provision has been made therefor, the clerk shall seasonably notify the governor of the inability of the judge to hold any of his terms."

The authority thus granted includes power as well as restriction. Note should be made that the statute simply repeats the constitutional words, whenever "the convenience or interest of the public shall require," etc., without defining the circumstances or otherwise limiting and prescribing what such "convenience" or "interest" must be. It seems too plain for argument *contra* that the exercise of the power granted to the judges of the district courts and the governor by virtue of the statute must have for its basis a determination of facts, a duty that is judicial or at least *quasi*-judicial. We therefore think that the Revision of 1905 should be construed in harmony with prior statutory law which had been in existence over a period of more than half a century. .

Under the familiar rule stated in 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 8931: "If the language of a law is reasonably susceptible of two constructions, one of which will render it constitutional and the other not, the former must be adopted though the latter is the more natural." It would seem that the construction here adopted harmonizes with the quoted language. The following cases sustain this view: State ex rel. Kirk v. Remmey, 170 Minn. 293, 212 N. W. 445; State ex rel. Hildebrandt v. Fitzgerald, 117 Minn. 192, 134 N. W. 728; Hunter v. City of Tracy, 104 Minn. 378, 116 N. W. 922; State ex rel. Utick v. Board of Co. Commrs. of Polk County, 87 Minn. 325, 92 N. W. 216, 60 L. R. A. 161; State ex rel. City of St. Paul v. District Court, 84 Minn. 377, 87 N. W. 942; McCormick v. Village of West Duluth, 47 Minn. 272, 50 N. W. 128. See also Harriman v. Interstate Commerce Comm. 211 U. S. 407, 29 S. Ct. 115, 53 L. ed. 253; Federal Trade Comm. v. American Tobacco Co. 264 U. S. 298, 44 S. Ct. 336, 68 L. ed. 696, 32 A. L. R. 786.

1 Mason Minn. St. 1927, § 183, relates to judicial districts wherein there is more than one judge. The judge longest in point of continuous service is the presiding judge of the district. The section then provides: "The business of the court may be divided between the judges, and otherwise regulated as they by rule or order shall direct." In the instant case the presiding judge (the Honorable Carroll A. Nye) duly designated and provided by his order that

Judge Cameron was to preside at the April, 1935, term of court. Judge Cameron ruled, as has been heretofore stated, that the case was properly triable before him. So we have direct conflict between the judiciary and the governor. It would lead to an unfortunate state of affairs were we to hold that the governor may by *ex parte* order override and make for naught the order of the district court properly entered and in conformity with statutory provisions. If § 183 is to be given effect, it necessarily means that the governor's power in cases of this nature is not unlimited and can only be exercised when and if the presiding judge or judges are disqualified within the statutory definition or that the business of the court is so congested as to cause unreasonable delay. There must be actual need for the change or substitution. Mere assertion without finding of fact upon which it is based cannot be permitted to stand.

The state cites and relies upon People ex rel. S. L. & T. Co. v. Extraordinary Sp. & T. Term of Supreme Court, 220 N. Y. 487, 116 N. E. 384, 385, and cases of similar import. It takes the position that in the absence of an affirmative showing to the contrary the designation by the governor of a substitute judge is conclusive. Quoting from the cited case [220 N. Y. 491] counsel for the state maintain that this "is a question for the governor, and no one else." This court has heretofore passed upon and pointed out the clear distinction that exists between the powers vested in the governor by the constitution and the powers conferred upon him by the legislature which might have been delegated to some other official. The following cases illustrate the distinction: State ex rel. Kinsella v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785; In re Application for Removal of Nash, 147 Minn. 383, 181 N. W. 570; State ex rel. Martin v. Burnquist, 141 Minn. 308, 170 N. W. 201, 609; State ex rel. Hilton v. Essling, 157 Minn. 15, 195 N. W. 539. Thus in State ex rel. Kinsella v. Eberhart, 116 Minn. 313, 319, 133 N. W. 857, 859, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785, this court said:

"It has been suggested that the judiciary should not assume jurisdiction in any case involving the action of the Governor, for the reason that the court might not be able to enforce obedience to its

orders. By virtue of his position as the commander in chief of the state's military forces, the Governor might possibly successfully resist enforcement of the court's writs; but, as stated in State v. Brooks, supra [6 L.R.A. (N.S.) 750], the jurisdiction of the court does not rest upon its physical ability to enforce its judgments. Jurisdiction depends upon the right of the court to hear the matter in controversy and to declare the law. The Governor, under his oath of office, is bound to enforce the law, and it will not be presumed that he would refuse to perform duties which the court of last resort declared to be imposed upon him. On the contrary, it will be presumed that in doubtful cases he would desire to be enlightened and guided by the judgment of that tribunal charged with the duty of declaring the law."

The constitutional separation of authority (Minn. Const. art. 3, § 1) forbids judicial interference with the exercise of the powers which that instrument places with the governor as the chief executive officer of the state. And, in similar fashion, his authority must not be permitted to interfere with or in any way limit the constitutional authority vested in the judiciary. Hence it seems to us that in criminal cases especially the utmost care should and must be exercised to avoid every appearance of partiality or advantage. The governor as the chief executive officer of the state must "take care that the laws be faithfully executed." Minn. Const. art. 5, § 4. It is clearly a judicial duty to see to it that fairness and impartiality be exercised in every phase of the conduct of such trial. As such, no governor should be placed in the light of one who seeks conviction of a person by means of anything having even the appearance of advantage. The necessity of protecting the judiciary from executive encroachment is obvious. Nothing could be more harmful to the orderly administration of justice than to permit or sanction what is here sought.

Upon the facts here presented, there being four duly elected, qualified, and acting resident judges in the seventh judicial district, competent and willing to serve, no accumulation of business preventing an orderly and prompt trial, an outside judge may not be substituted by executive order because so to do would be a direct

encroachment by the executive upon the functions of the judiciary and as such not constitutionally permissible. We conclude that the order here for review is without authority and void and that the alternative writ should be made permanent.

So ordered.