## BEMIS BRO. BAG COMPANY v. GEORGE E. WALLACE AND OTHERS.
## S. H. CLAUSIN & COMPANY v. SAME.[1]

April 24, 1936.

Nos. 30,842, 30,843.

*Harry H. Peterson,* Attorney General, *William S. Ervin,* Deputy Attorney General, *F. A. Pike,* Assistant Attorney General, *Ed J. Goff,* County Attorney, *Frank J. Williams,* Assistant County Attorney, and *Richard Wiggin,* City Attorney, for appellants.

[1]Reported in 266 N. W. 690.

*Kingman, Cross, Morley, Cant & Taylor* and *Kellogg, Morgan, Chase, Carter & Headley,* for respondent Bemis Bro. Bag Company.

*Cobb, Hoke, Benson, Krause & Faegre, J. B. Faegre, Glenn S. Stiles,* and *Hayner N. Larson,* for respondent S. H. Clausin & Company.

*Fowler, Carlson, Furber & Johnson, G. A. Youngquist, Stinchfield, Mackall, Crounse, McNally & Moore, Thomas P. Helmey, Sanborn, Graves, Appel & Andre, William G. Graves, J. Neil Morton,* and *Morris B. Mitchell, amici curiae,* filed briefs in support of the contention of respondents.

JULIUS J. OLSON, JUSTICE.

Two appeals are before us from orders denying defendants' separate motions for new trials. In these suits Bemis Bro. Bag Company, a foreign corporation, and S. H. Clausin & Company, a domestic corporation, are the respective plaintiffs. Defendants are the members of the state tax commission and the taxing officers of Hennepin county. The cases were heard together below and, by reason of the similarity in factual and legal issues involved, have been similarly submitted here. Counsel have furnished us with elaborate briefs which have been found most helpful in arriving at a solution of the problems presented.

Both proceedings were brought under the uniform declaratory judgments act, L. 1933, c. 286, 3 Mason Minn. St. 1934 Supp. §§ 9455-1 to 9455-16, to determine the validity and construction of 1 Mason Minn. St. 1927, § 2021, and the rights and status of each plaintiff thereunder. The last mentioned statute is what is commonly referred to as the "corporate excess tax act."

The issues presented are: (1) Whether said § 2021 has been repealed by implication, and (2) if not so repealed, whether it may be constitutionally applied to the respective plaintiffs. If the first question is answered in the affirmative that will obviate the necessity of going into the second, which obviously will require inquiry into and determination of many grave and perhaps doubtful constitutional issues.

These suits were brought as result of written demands made by the Minnesota tax commission requiring each plaintiff to prepare and file a return for 1933 "as required under provisions of" the mentioned section. Each plaintiff was informed thereby that upon failure so to comply the commission would make such statement and return, "from the best information it can obtain and cause a levy to be made against you for such amount as it appears should be made." Forms prepared by the commission and to be used by each plaintiff in making the required returns were furnished. These forms definitely designated said § 2021 as the statutory authority and direction for the making of the return and what it was to contain. The section is quoted in the margin.[2]

---

[2]"2021. The president, secretary, or principal accounting officer of every company and association, incorporated or unincorporated, except railroad, insurance, telegraph, telephone, express, freight line, and sleeping car companies, and banking corporations whose taxation is specifically provided for in this chapter, when listing personal property, shall also make out and deliver to the assessor a sworn statement of the amount of its capital stock, setting forth particularly:

"1. The name and location of the company or association.
"2. The amount of capital stock authorized, and the number of shares into which it is divided.
"3. The amount of capital stock paid up.
"4. The market value, or, if they have no market value, then the actual value, of the shares of stock.
"5. The value of its real property, if any.
"6. The value of its personal property.
"7. The total amount of all indebtedness, except the indebtedness for current expenses, excluding from such expenses the amount paid for the purchase or improvement of property.

"The aggregate amount of the fifth and sixth items shall be deducted from the total amount of the fourth item, and the remainder, if any, shall be listed as 'bonds or stocks,' under [R. L.] § 835, subd. 23 [2019]. The real and personal property of each company or association shall be listed and assessed the same as that of private persons. If the proper officer shall fail or refuse to make such statement, the assessor shall make such statement from the best information he can obtain. Mortgages of building associations, which are represented in their stock and assessed as stock, shall not be assessed as mortgages. They shall list their real estate and all personal property as provided in this section."

In substance and effect the claims made by the respective parties apply to both corporate enterprises; hence we shall discuss them together except where otherwise indicated. Hereafter we shall refer to the respective cases, when referring to them separately, as the "Bemis" or "Clausin" case.

There is no worth-while factual dispute. The Bemis company is a Missouri corporation and has been in business ever since 1885. Its principal office is at St. Louis. Since 1907 it has been duly qualified to do business in this state under our foreign corporation law. Its business is and has been the manufacture and sale of burlap, cotton, and paper bags. It owns and operates manufacturing plants and factories in 14 states of the Union and in Canada. In addition thereto, it owns cotton mills in Tennessee, Alabama, and Indiana, a cotton bleachery plant, also located in Indiana, and a paper mill in Illinois. It is authorized to do business in 13 of our states; also in the province of Manitoba.

On May 1, 1933, it was the owner of stocks of merchandise and other assets of very considerable value kept at its various plants and factories. Each factory is a complete and independent unit for its particular purpose, maintaining its own sales force and other employes. Books and records with regard to the business done at each such place of business are there kept and maintained. On the date mentioned it had funds on deposit at St. Louis and at other points throughout the United States and Canada where its factories, plants, and mills are located. It owned notes and accounts receivable carried on its books at its various factories and plants. It also owned various investments in bonds, stocks, and other securities, including obligations of the United States. No part of such bonds, stocks, or other securities was kept or had a situs in Minnesota during 1933. As far as this state is concerned it owned no franchise unless its qualification to do business in Minnesota may be so considered. It had no funded or bonded indebtedness but did have current and demand indebtedness.

During the times mentioned other corporations doing the same or similar business, both domestic and foreign, were also doing business in Minnesota and in competition with it and had property

within our borders. As to many of these their indebtedness, deductible under the section quoted, was such as to leave no excess value or at least to reduce such values to a very considerable and important extent. Something over 85 per cent of its manufactured products are sold and delivered outside of our state. Of the manufactured products here made, at least 10 per cent are shipped and delivered to customers beyond our borders.

All real estate, personal property, moneys and credits, and income taxes within Minnesota for the year 1933 were duly paid.

The court found the facts substantially as related and further that the section sought to be interpreted had been treated and publicly stated in documentary and other forms by the tax commission and taxing officers in general as "a dead letter" and as "obsolete"; that there had been no general or sustained efforts on the part of officials of the state or its political subdivisions charged with the duty of administering and enforcing the tax laws of the state to apply or enforce the provisions of that section or to impose any tax or assessment thereunder; that as to foreign corporations there never had been, prior to the making of the demand hereinbefore referred to, any appreciable effort by taxing officials to impose such tax, except in a few isolated instances. The court was of opinion that because of subsequently enacted taxing statutes, to which reference will be made hereafter, the quoted section has been "superseded and repealed"; that the section "was never, and is not now, applicable to foreign corporations and is now and always has been inapplicable to plaintiff"; also, that "said statute imposes no duty or obligation upon plaintiff, and plaintiff is subject to no tax pursuant to said statute or upon the subject matter which said statute purports to tax."

The facts relating to the Clausin case are substantially the same except that it is a domestic corporation organized in 1905 by the individual who theretofore had operated the same business as is now being conducted by the corporation. Its business is that of a wholesale jeweler. In the conduct of its affairs it maintains two distinct and independent offices, the home or domestic office being in Minneapolis, and the other at Spokane, Washington. Each office

has its own supply of merchandise, sells in territory of its own, keeps separate books and records, and maintains and collects its own accounts. Each has its own independent staff of employes and salesmen, including as well funds with which to do the business, and makes its own disbursements. The combined results of the affairs and operation of the two offices are reflected upon a general ledger kept in Minneapolis. There entries are made periodically upon the basis of monthly and annual reports prepared by each such office.

On May 1, 1933, the market or actual value of its outstanding shares was in excess of the market value of its tangible property and moneys and credits. It owned no obligations of the United States or of this state or any of its political or governmental subdivisions.

In respect of the tax commission's demands and requirements with regard to making a return for the purpose of assessment, the facts are identical with those heretofore related in the Bemis case, and no further comment need be made respecting the same.

The authorized capital stock consisted of 3,500 shares of common stock of the par value of $100. The shares issued and outstanding number 3,325. These shares were not listed on any stock exchange nor were they generally dealt in by way of sale or exchange. Prior to the date of incorporation Mr. Clausin conducted the business as an individual. In exchange for the physical property owned by him he took the stock issued by the then newly formed corporation and has since so conducted it.

The court reached the same result here as in the Bemis case and for substantially the same reasons.

Taxation always has been a matter of concern to all people, rich and poor alike. In some form or other the cost of government must necessarily be met by taxation. It is a burden or charge imposed by legislative power upon persons or property to raise money for public purposes. 61 C. J. p. 65. The essential characteristics of a tax are that it is not a voluntary payment or donation, but an enforced contribution, exacted pursuant to legislative authority, in the exercise of the taxing power. *Id.* p. 68. It is likewise elemen-

222

tary that the power of taxation is inherent in sovereignty and that under our system of government it reposes in the legislature except as it is limited by the state or national constitutions. Reed v. Bjornson, 191 Minn. 254, 257, 253 N. W. 102.

As long ago as September 19, 1796, President Washington, in his farewell address, said:

"To have Revenue there must be taxes—that no taxes can be devised, which are not more or less inconvenient and unpleasant—that the intrinsic embarrassment, inseparable from the selection of the proper objects (which is always a choice of difficulties) ought to be a decisive motive for a candid construction of the conduct of the Government in making it, and for a spirit of acquiescence in the measures for obtaining Revenue, which the public exigencies may at any time dictate."

That the chief executive of our state fully recognized the importance of the questions before us clearly appears from the inaugural message delivered January 9, 1935, to the legislature of this state. He said:

"I am sure that we are all in accord in a desire to shift the burden of taxation from real estate as much as possible. That can partially be accomplished by a drastic strengthening of the money and credits tax law.. A more substantial shift can be accomplished through the medium of the so-called corporate excess tax law passed at the legislative session of 1879 [1878]. A test case to determine the constitutionality of that law is now pending. A reading of court decisions, including one by the Supreme Court of the United States, on identical legislation in other states, suggests that the law will be sustained. *I am of the opinion that the assessment of this tax upon a personal property basis, particularly if collection was made for unpaid taxes during past years, would result in confiscation of corporate properties.* A law fair in its terms, however, can be devised. If that is not done, and the 1879 [1878] statute is upheld by the Court, there will be no choice but to invoke the authority of the state for full collection." (Italics ours.)

The governor probably had in mind, when making the statement italicized above, the forceful language used by Chief Justice Marshall in McCulloch v. The State of Maryland, 4 Wheat. 316, 431, 4 L. ed. 579, as follows: "* * * the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; * * *."

That the great Chief Justice fully recognized the importance of the case there decided appears from that opinion in the following language (4 Wheat. 400):

"The constitution of our country, in its most interesting and vital parts, is to be considered; the conflicting powers of the government of the Union and of its members, as marked in that constitution, are to be discussed; and an opinion given, which may essentially influence the great operations of the government. No tribunal can approach such a question without a deep sense of its importance, and of the awful responsibility involved in its decision."

We approach the questions here presented with the same feeling of responsibility and fully mindful of the solemn duties resting upon us to find a solution legally sound and just.

The quoted section had its origin in L. 1878, c. 1, § 22, and was incorporated in the General Statutes of that year, c. 11, § 22. In substance and effect it has remained the same throughout these many years except for minor changes unimportant here. Since R. L. 1905 there has been no change.

In 1907, immediately following the adoption of the "wide open" tax amendment to our constitution, the mortgage registry tax was enacted. 1 Mason Minn. St. 1927, §§ 2322-2336. By virtue of that act all mortgages upon which the specified tax had been paid, including the debt thereby secured, were exempted from all other taxes. The next change occurred in 1911 and related to what is known as the "money and credits" tax (L. 1911, c. 285), now 1 Mason Minn. St. 1927, §§ 2337-2349. Here, too, all property included under the terms of that act was exempted from all other taxes. In 1917 (L. 1917, c. 130) a very significant amendment, now embodied in § 2337, was made so that the definition of "money and

224

credits" included "all shares of stock in corporations the property of which is not assessed or taxed in this state." See L. 1923, c. 102. In 1933 the income tax law was enacted. This was made to apply to domestic as well as foreign corporations. By its terms it is made "an annual tax for the privilege of existing as a corporation or of transacting any local business within this state during any part of its taxable year." L. 1933, c. 405, art. II, § 2, 3 Mason Minn. St. 1934 Supp. §§ 2394-1 to 2394-58.

It was the view of the trial court that these subsequent enactments have by implication repealed § 2021. This the state denies, and upon this issue the present appeals hinge.

■ In behalf of the state it is urged that § 2021 is not a taxing statute at all but is designed only to provide the taxing officers of the state with information "whereby the value of bonds or stocks therein referred to can be determined." It maintains that § 1974 is applicable to the levying of the tax here sought to be imposed. Therefore it may be well first to consider this particular phase of the controversy. It will be noted, as has been said before, that § 2021 has remained unaltered in substance and effect over a period of nearly 58 years. In 1899 this court in State v. Duluth Gas & Water Co. 76 Minn. 96, 103, 78 N. W. 1032, 1033, 57 L. R. A. 63, said:

"Without stopping to discuss at length the whole scheme of taxation provided in our tax laws, an analysis and comparison of its various provisions satisfy us that the legislature intended G. S. 1894, § 1530, to be the *exclusive method of listing and taxing the property of all corporations and companies falling within the purview of that section.*" (Italics ours.)

The section therein referred to is the same as our present § 2021. State v. N. P. Ry. Co. 95 Minn. 43, 46, 103 N. W. 731, 732, refers to this section as designed to "tax the property and capital stock of the ordinary domestic corporation." In State v. Western Union Tel. Co. 96 Minn. 13, 21, 104 N. W. 567, 571, the court again referred to this section as the one determining "the value of their property of all kinds as a system." Other cases pointing in the

same direction are State v. Cudahy Packing Co. 103 Minn. 419, 423, 115 N. W. 645, 1039; State v. Farmers & M. Sav. Bank, 114 Minn. 95, 104, 130 N. W. 445, 851. The North Dakota supreme court in Grand Forks County v. Cream of Wheat Co. 41 N. D. 330, 338, 170 N. W. 863, 865, referred to the fact that the statute there for consideration was adopted from Minnesota and quoted with approval the language of Mr. Justice Mitchell in the Duluth Gas & Water Co. case, 76 Minn. 96, 78 N. W. 1032, 57 L. R. A. 63, and, as applied to that section of its statute corresponding to our § 2021, said it was "the exclusive method of listing and taxing the property of all corporations and companies" falling within its purview. See also State ex rel. Attorney General v. Lion Oil Refining Co. 171 Ark. 209, 284 S. W. 33.

As a matter of administrative construction it appears without question that the tax commission and other taxing officers have considered this particular section as the only one applicable to the taxation of intangibles owned by corporate enterprises. The many reports, booklets, and instructions, including assessors' manuals published and distributed by the commission and by their direction, directly referred to this section as authority for "the assessment and taxation of the so-called 'corporate excess.'" In many of their reports this section was condemned as "obsolete" and as "a dead letter." "As a general rule not only do these business corporations not make the required statement, but whenever any isolated corporation does make it, the result is of no value so far as taxation is concerned." Its repeal was urged because, "It is of no aid to a correct assessment of corporations. It is a dead letter in practice and while it remains upon the statute books it is an annoyance to the corporations and an embarrassment and stumbling block to all taxing officials. It is an exploded experiment, and its debris should be consigned to the junk pile."

Section 1974 is substantially the same as § 1 of the 1878 act. That section was in effect when this court in the Duluth Gas & Water Co. case, 76 Minn. 96, 103, 78 N. W. 1032, 57 L. R. A. 63, held what is now § 2021 to be "the exclusive method of listing and taxing" corporate excess.

Counsel for the state refer us to State v. McPhail, 124 Minn. 398, 145 N. W. 108, 50 L.R.A. (N.S.) 255, Ann. Cas. 1915C, 538, as authority for their claim. But they overlook the important fact that the tax there imposed was not against the Duluth Board of Trade but upon a membership in the hands of a member. Hence it cannot be said to be an authority that § 1974 is operative against a corporate enterprise. In State ex rel. Goetzman v. Minnesota Tax Comm. 136 Minn. 260, 161 N. W. 516, 517, the tax was levied against and upon memberships in the Minneapolis Chamber of Commerce, not against the Chamber itself. This court said (136 Minn. 263):

"The members are in the general position of stockholders. * * * Members should not be required to pay taxes on the value of their memberships represented by the tangible property of the chamber already assessed. Upon the excess value they should pay."

In State v. Molyneaux, 185 Minn. 199, 200-201, 240 N. W. 468, 469, the state sought to tax defendant's membership in the Minneapolis-St. Paul Stock Exchange. The facts were that the property assessed to the association exceeded the value of the memberships. Under such circumstances "no tax can be assessed against the members on account of the memberships. To tax the members in that situation would be duplicate taxation—something to be avoided if possible. Where an association of this sort, in addition to tangible property taxed, has intangible assets, such as good will and the like, which gives added value to a membership certificate over and above the proportionate value of the share belonging to it of the tangible property separately taxed, then properly such additional value should be taxed to individual members. * * * The status and property rights as between such associations and its members are essentially like those of corporations and its stockholders—the certificate of membership conferring the same right to the property of, or interest in, the association as a stock certificate does in a corporation. As to domestic corporations, when the tax is ascertained and paid precisely in the manner here done as to this association, the statute does not provide for the taxation of the stockholders upon their stock. The stockholder therein is free from any

tax as a stockholder. State v. Nelson, 107 Minn. 319, 119 N. W. 1058. And in the case of a resident owning stock in a foreign corporation, the statute expressly directs that it be taxed as moneys and credits."

In State v. N. P. Ry. Co. the court said (95 Minn. 46, 47):

"It [referring to G. S. 1894, § 1530, now § 2021] is designated to tax the property and capital stock of the ordinary domestic corporation. The requirements to list can only be derived, if at all, from §§ 1515 to 1524, inclusive. These sections construed individually or as a whole contain no clear, positive, or specific enactments to that end. The stipulation in this case shows that the universal and long-continued practice in all departments of the state government has so interpreted these sections as not to require returns from railway companies as to taxable property not taxed under the gross earnings law. Marshall, C. J., said in Cohens v. Virginia, 6 Wheat. 418, 5 L. ed. 257: 'Great weight has always been attached, and very rightly attached, to contemporaneous exposition.'" Citing numerous cases.

Prior decisions of this court, hereinbefore cited, coupled with more than half a century of administrative and executive acquiescence, preclude the notion that doubt should any longer remain that § 2021 was enacted as a taxation statute. And we think it is equally clear that § 1974 was not intended to be, nor has it been at any time since its enactment, a statute applicable to corporate excess taxation.

■ The result, if defendants' contentions were to be sustained, would, in the language of our chief executive, probably "result in confiscation of corporate properties." It is inconceivable that any legislator had any such intention in mind when the act was originally adopted or when the subsequent acts, to which reference has been made, were passed. After all, the members of the legislature represent the taxpaying public, both individual and corporate. We are quite certain that not to a single one of them did the idea ever occur that "the power to tax involves the power to destroy." Such power can only exist when and if it is unrestrained. It is foreign

to our theory of government that taxation should be used for destructive purposes. Obviously that would be the equivalent of confiscation. When and if that condition is reached, property rights will no longer exist. The right of the individual to acquire, hold, and enjoy property must then depend upon the mere will of a well organized majority happening to be in control of the machinery of government when confiscation is desired.

The Federal Supreme Court in McCray v. United States, 195 U. S. 27, 56, 24 S. Ct. 769, 49 L. ed. 78, 95-96, 1 Ann. Cas. 561, said:

"As quite recently pointed out by this court in Knowlton v. Moore, 178 U. S. 41, 60, 20 S. Ct. 747, 44 L. ed. 969, 977, the often quoted statement of Chief Justice Marshall in McCulloch v. Maryland [4 Wheat. 316, 4 L. ed. 579], that the power to tax is the power to destroy, affords no support whatever to the proposition that where there is a lawful power to impose a tax its imposition may be treated as without the power because of the destructive effect of the exertion of the authority."

"Taxation is an intensely practical matter and laws in respect of it should be construed and applied with a view of avoiding, so far as possible, unjust and oppressive consequences." Farmers L. & T. Co. v. Minnesota, 280 U. S. 204, 212, 50 S. Ct. 98, 100, 74 L. ed. 371, 375, 65 A. L. R. 1000.

And this court in Board of Co. Commrs. of Rice County v. Citizens Nat. Bank, 23 Minn. 280, 281-282, said:

"The general policy of the law is to avoid duplicate taxation. No one subject of taxation ought to be required to contribute more than once to the same public burden, while other subjects of taxation, belonging to the same class, are required to contribute but once. In the exposition of any tax law, therefore, a construction leading to any such result should be avoided, unless the cogency of some express provision or unavoidable implication of the statute compels its adoption. Says Judge Cooley, in his valuable treatise on the law of taxation: 'It is a fundamental maxim in taxation that the same property shall not be subject to a double tax payable by the same party, either directly or indirectly; and, when it is once

decided that any kind or class of property is liable to be taxed under one provision of the statute, it has been held to follow, as a legal conclusion, that the legislature could not have intended the same property should be subject to another tax, though there may be general words in the law which would seem to imply that it may be taxed a second time.' "

Intrinsic, too, in § 2021 is abundant evidence of careful effort to prevent double taxation. That is the purpose of the sentence concerning the mortgage of building associations "which are represented in their stock," and in consequence "shall not be assessed as mortgages."

As far as, in the case of corporations, corporate· excess was the target of § 2021, it included all credits. It also included the additional value, if any, attributable to franchises or good will or both. Whatever the components of the corporate excess, it was all lumped off by the statute and classified for taxation, *ad valorem,* as "bonds or stocks."

Of the special category of "bonds or stocks" so created in 1878, nothing remains. First, all mortgage credits were removed by the mortgage registry tax law. Next, all other credits were taken over by the new and special plan of the money and credits tax. There was left then only good will and franchise. Both, as property, are included within the express subject (as to corporations) of the income tax law, *i. e.,* "the privilege of existing as a corporation."

In short, the plan of § 2021 for the taxation of corporate excess has been repealed, for the simple reason that subsequent statutes have taken over, separately, every component of corporate excess for new and special taxation.

Clearly, if an earlier statute taxed franchises and good will generally (and that is just what is claimed for § 2021) without saying precisely how, *e. g.,* as by a property tax or an excise, a later statute expressly taxing franchises by a specific property or excise tax would repeal the earlier law. That is so because the later law obviously intended to cover the whole field with a new plan and changed scheme of taxation.

What was said in State ex rel. Winona Motor Co. v. Minnesota Tax Comm. 117 Minn. 159, 161-162, 134 N. W. 643, 644, seems applicable:

"But here the new statute is complete in itself, and comes clearly within the rule of implied repeal. There can be no serious question but that the legislature intended a modification of the policy of the state in respect to this form of taxation. The lawmakers recognized the difficulties encountered under the old system, and, to avoid the injustice of taxing credits at the rate imposed upon other property, the new system was devised, and the tax laid and fixed at a very low rate. If there had been any intention to continue in force the policy of allowing the deduction of debts, the rate would undoubtedly not have been changed, and the reduction thereof to a minimum is fairly indicative of a purpose, as disclosed in section 1, to tax all credits at their fair cash value, without reference to debts and obligations of the person listing the same. This complete revision of the law brings the statute fairly within our decisions holding to the rule of implied repeal." Citing cases.

"If a statute is manifestly inconsistent with a prior statute covering the same subject it repeals it, in whole or pro tanto, without any repealing clause, in the absence of an expressed intention to the contrary." 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 8927, and cases under note 21.

See also Board of Education v. Borgen, 192 Minn. 367, 256 N. W. 894.

If, after the old law, the lawmakers had declared that all of its subject matter should be taxed otherwise and in special fashion, there would, of necessity, have been an implied repeal of the elder statute even though it had not been specially done away with. The same result follows where, category by category, the subject matter of the old law has been subjected to new and special treatment.

The only stated disagreement in the present application of that elementary proposition is that the subjects of the mortgage registry tax law, the moneys and credits tax law, and the income tax law do not include good will and in no way conflict with the corporate excess tax.

The income tax law is, as to corporations, a self-christened franchise tax measure. Moreover, and especially important, its levy is measured by income. "Franchise value," no one will deny, is measured in the case of a corporation by income. That phrase, "franchise value," in revenue law, is ordinarily taken to include and "mean the value of the intangible property." Western Union Tel. Co. v. City of Omaha, 73 Neb. 527, 539, 103 N. W. 84, 88. Especially when it is measured by income, the real incidence of the levy is not on "the right to do the thing, but the doing of it in fact." James v. Kentucky Refining Co. 132 Ky. 353, 354, 113 S. W. 468, 469. Hence the "franchise" so taxed "embraces all the intangible property of the company." Commonwealth v. Chesapeake & Ohio Ry. Co. 122 Ky. 283, 91 S. W. 672-674. Inasmuch as the ordinary franchise tax on corporations "depends upon the business transacted by the corporation and the extent to which they have exercised [and profited by] the privileges granted in their charter" (Home Ins. Co. v. New York State, 134 U. S. 594, 605, 10 S. Ct. 593, 597, 33 L. ed. 1025), it necessarily includes all tangible values whether they be called "good will," "going concern value," or anything else. The practical and legal view, as distinguished from any esoteric characterization, is that "the amount of the tax is dependent upon their [the corporations] business prosperity, as evidenced by their capacity to declare dividends." People v. Knight, 174 N. Y. 475, 480, 67 N. E. 65, 67, 63 L. R. A. 87-89. That being so, all tangible property being otherwise specially taxed, how comes it that all intangible values are not covered by a franchise tax measured by income?

A franchise tax as applied to a corporation is, from the practical standpoint, not an imposition on "the right to do the thing, but the doing of it in fact." James v. Kentucky Refining Co. 132 Ky. 353, 354, 113 S. W. 468, 469. That inescapable truth was understood by the framers of our income tax law, for, as applied to corporations, its levy is, explicitly, "an annual tax for the privilege of existing as a corporation or of transacting any local business within this state." L. 1933, c. 405, art. II, § 2.

It being plain that all intangible assets are in fact taxed under the new income tax law, it is equally obvious that to tax them again;

*ad valorem,* under the old property tax statutes, would impose double taxation. That, obviously, and under all the rules of sense, of law, and of hermeneutics, the legislature did not intend.

The conclusion we have reached cannot be said to be judicial invasion of the legislative domain. Double taxation under both the *old general* and the *new special* statute is abhorrent to all rules of interpretation of statutory enactments, and to common sense as well.

Each order is affirmed.

DEVANEY, CHIEF JUSTICE (dissenting).

I cannot agree with the majority opinion. The action of the court here is a usurpation of the function of the legislature by the judiciary and is a manifestation of the fast-growing evil of judicial autocracy. The constitutional separation of authority forbids judicial interference with the exercise of legislative duties and functions. Thus we find our court saying:

"* * * under constitutions, similar to that of this state, where all power and authority of government are vested in three distinct, co-ordinate and independent departments—the legislative, the executive and the judicial—the judicial has not the power to control, coerce or restrain the action of the other two within the sphere allotted them by the Constitution wherein to exercise judgment and discretion." State ex rel. Burnquist v. District Court, 141 Minn. 1, 16, 168 N. W. 634, 636, 3 A. L. R. 1476.

Nowhere is there anything express or implied indicating that the legislature ever repealed or intended to repeal the corporate excess tax law. The result of the majority decision, therefore, is, not repeal by the legislature but by the court—not legislative repeal, but judicial repeal. In marked contrast to its attitude in the instant case, this court has—as the head of the judicial branch of government in this state—jealously guarded and protected its own powers and functions from encroachment by the other divisions of our state government. In the recent case of State ex rel. Decker v. Montague, 195 Minn. 278, 288, 262 N. W. 684, 689, this court said:

"The necessity of protecting the judiciary from executive encroachment is obvious. Nothing could be more harmful to the orderly administration of justice than to permit or sanction what is here sought."

The "necessity of protecting the judiciary from executive encroachment" should be no more important to us, the judiciary, than is the necessity of protecting the legislature from judicial encroachment. Surely the rights of the people can best be served by protecting each branch of the government from any encroachment by another. As stated in the Sinking Fund Cases, 99 U. S. 700, 718, 25 L. ed.' 496:

"One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule."

There are no provisions in any of the subsequent statutes expressly repealing § 2021. There is nothing inconsistent with this statute in the later taxing statutes. A tax on corporate excess is a tax imposed on the good will of a corporation as property. Adams Express Co. v. Ohio State Auditor, 166 U. S. 185, 17 S. Ct. 604, 41 L. ed. 965. The mortgage registry tax law, the moneys and credits tax law, and the income tax law do not tax good will and in no way conflict with the corporate excess tax. The income tax as applied to corporations is a privilege tax. Rottschaefer, "The Minnesota State Income Tax," 18 Minn. L. Rev. 93, 94-105. The error in the majority opinion comes from a failure to differentiate between a tax on the *exercise of the privilege* as in the case of the income tax and a tax *on the privilege itself as property*. The fact that the taxing authorities have failed to comply with the statute in question is neither material nor controlling. Such a fact is pertinent only as an aid to interpretation where a statute is ambiguous. State ex rel. O'Hearn v. Erickson, 152 Minn. 349, 188 N. W. 736. There is no ambiguity in § 2021; hence there is no room for interpretation or consideration of administrative construction. It is axiomatic that repeals by implication are not favored, and no statute should be held to repeal another unless the two are so irreconcilable as to make it impossible to give effect to both. Frost v.

Wenie, 157 U. S. 46, 15 S. Ct. 532, 39 L. ed. 614. This principle was not applied by the majority of the court in this case.

If the rule of judicial repeal is to stand it will not only serve the purpose of defeating reform but may even accomplish the overthrow of popular rights which the constitution expressly guarantees. The right to nullify or veto an act of the legislature, being purely political, is clearly beyond the constitutional powers of the judiciary.

The orders appealed from should be reversed.