**The NINETIETH MINNESOTA STATE SENATE, et al., Respondents,**

v.

**Mark B. DAYTON, in his official capacity as Governor of the State of Minnesota, et al., Appellants.**

**A17-1142**

Supreme Court of Minnesota.

Filed: November 16, 2017

Douglas A. Kelley, Steven E. Wolter, Kevin M. Magnuson, Brett D. Kelley, Kelley, Wolter & Scott, P.A., Minneapolis, Minnesota; and David F. Herr, Maslon LLP, Minneapolis, Minnesota, for respondents.

Sam Hanson, Scott G. Knudson, Scott M. Flaherty, Emily M. Peterson, Briggs and Morgan, P.A., Minneapolis, Minnesota, for appellants.

Harry N. Niska, Ross & Orenstein LLC, Minneapolis, Minnesota; and Kimberly Reynolds Crockett, Center of the American Experiment, Golden Valley, Minnesota, for amicus curiae Center of the American Experiment.

## OPINION

GILDEA, Chief Justice.

On May 25, 2017, the Ninetieth Minnesota State Senate and the Ninetieth Minnesota State House of Representatives (collectively, the Legislature) each adjourned *sine die*, ending the special session that began on May 23, 2017. On May 30, 2017, the Governor vetoed line-item appropriations to the Legislature for its biennial budget. The Legislature commenced this action, contending, in part, that the line-item veto power cannot be used over the appropriations to itself without violating the Separation-of-Powers clause, Minn. Const. art. III. The Governor contends that the line-item veto power is expressly conferred on the Executive by Article IV, Section 23 of the Minnesota Constitution, and thus its exercise, even over an appropriation for the Legislative Branch of government, cannot violate the Separation-of-Powers clause. The district court held that the line-item vetoes were unconstitutional under Article III. We granted the Governor's petition for accelerated review.

For the first time in Minnesota history, we are asked to resolve a lawsuit brought by one of our coordinate branches of government—the Legislative Branch—against our other coordinate branch of government—the Executive Branch. We conclude in these unprecedented circumstances that proper respect for our coordinate branches counsels judicial restraint.

On the Article IV issue, we conclude that the line-item vetoes did not violate Article IV, section 23. On the Article III issue, we conclude that the line-item vetoes did not violate Article III by effectively abolishing the Legislature, but we decline to decide whether those vetoes nevertheless violated Article III as unconstitutionally coercive. We exercise restraint on the coercion aspect of the Article III issue because Article IV of the Minnesota Constitution—addressing the legislative process—textually commits to the Legislature and the Governor the powers to resolve

political disputes that arise in the course of that process, including the process of appropriating funding. The parties have so far failed to resolve their dispute through the legislative process our constitution contemplates. Nevertheless, the record now before us demonstrates that the Legislature has access to the funding it says it needs to continue its legislative functions until it reconvenes in the next regular session. At that time, the Legislature, unconstrained by gubernatorial conditions for a special session, can exercise its constitutional appropriations powers. We, therefore, decline to resolve the question of whether the line-item vetoes violated Article III as unconstitutionally coercive. Based on the analysis that follows, we reverse in part, vacate in part, and remand to the district court for entry of dismissal.

## FACTS

This case arises from events that occurred at the end of the 2017 legislative session. By the last day of the 2017 regular session, May 22, 2017, most of the final budget bills for the next biennium—fiscal years 2018–2019—had not been presented to the Governor. As required by the constitution, the Legislature adjourned, choosing to reconvene on February 20, 2018. Sen. Journal, May 22, 2017, at 6101; House Journal, May 22, 2017, at 7022; see Minn. Const. art. IV, § 12 ("The legislature shall not meet in regular session ... after the first Monday following the third Saturday in May of any year.").

The Governor, by formal proclamation, called a special session that began at 12:01 a.m. on May 23, 2017. Proclamation for Special Session 2017, 2017 Minn. Laws 1st Spec. Sess. 1015; see Minn. Stat. § 4.03 (2016) (requiring the Governor to call a special session "by proclamation"). As noted in the Governor's proclamation, legislative leaders "ha[d] agreed on an agenda and procedure" for the special session. Specifically, legislative leaders and the Governor agreed that the special session would "be confined to the outstanding budget bills and the tax bill," the bills would be "voted upon or passed by either body within one legislative day," and the Legislature would "adjourn the Special Session no later than 7:00 a.m. on May 24, 2017."

The Legislature did not vote upon or pass the outstanding bills within one legislative day and did not adjourn on May 24, 2017. The special session continued until May 25, 2017. On that day, the House "adjourned sine die for the 2017 Special Session," House Journal, May 25, 2017, at 64; as did the Senate, Sen. Journal, May 25, 2017, at 111 ("[T]he Senate do now adjourn the Special Session sine die."). Bills passed during the special session were presented to the Governor on May 26, 2017.

One of the bills passed during the special session and presented on May 26 was the state government appropriations bill, Senate File No. 1. In article I, section 14 of this bill, the Legislature appropriated funds to the Department of Revenue for that agency's biennial budget. Act of May 30, 2017, ch. 4, art. 1, § 14, 2017 Minn. Laws 1st Spec. Sess. 1409, 1420–23. But the Department of Revenue's appropriation would not be effective "until the day following enactment of ... House File No. 1." Id. at 1421. House File No. 1 made amendments to a variety of the state's tax laws. Act of May 30, 2017, ch. 1, 2017 Minn. Laws 1st Spec. Sess., at 1017. The parties agree that the effect of article I, section 14 of Senate File No. 1 was that a veto of House File No. 1, the tax bill, would mean there would be no appropriation for the Department of Revenue for the next biennium.

Section 2 of Senate File No. 1 provided appropriations to the Legislature for each

fiscal year (FY) in the next biennium, allocated to the House, Senate, and Legislative Coordinating Commission (LCC)[1] as follows:

| | | |
|---|---|---|
| Senate: | $32.299 million (FY 2018) | $32.105 million (FY 2019) |
| House: | $32.383 million (FY 2018) | $32.383 million (FY 2019) |
| LCC: | $17.511 million (FY 2018) | $17.681 million (FY 2019) |

Act of May 30, 2017, ch. 4, art. 1, § 2, 2017 Minn. Laws 1st Spec. Sess. 1409, 1410–11.

On May 30, 2017, the Governor signed all but one of the bills presented at the end of the 2017 legislative session,[2] including

- Page 2, Line 24: Subd. 2 Senate
- Page 2, Line 25: Subd. 3 House of Representatives

the tax bill, House File No. 1, and the appropriations bill, Senate File No. 1.[3] In section 2 of Senate File No. 1, however, the Governor line-item vetoed the following provisions:

| | | |
|---|---|---|
| 32,299,000 | 32,105,000 |
| 32,383,000 | 32,383,000 |

S.F. 1, § 2, 90th Minn. Leg. 2017. The Governor did not veto the biennial appropriations of approximately $35 million for the LCC.

The Governor notified the Senate that he had "line-item veto[ed] the appropriations for the Senate and House of Representatives to bring the Leaders back to the table to negotiate provisions" in three bills that the Governor had just signed and that subsequently became law. Specifically, the Governor said that there were provisions in the "Tax, Education and Public Safety" bills that he could not "accept." He explained to legislative leaders that he

"veto[ed] the appropriations for the House and Senate" for the next biennium because the Legislature's "job has not been satisfactorily completed." He offered to call a special session if the Legislature would agree to "remove" or "re-negotiate" the provisions the Governor found objectionable in the Tax, Education, and Public Safety bills stating, "I . . . await your response."

On June 13, 2017, the Legislature filed a complaint in Ramsey County District Court. In count one, the complaint sought a declaration that the Governor's line-item vetoes were unconstitutional as a violation

1. The Legislative Coordinating Commission coordinates the activities of the Legislature, providing staff support and administrative and other services to commissions, agencies, and boards established by the Legislature. *See* Minn. Stat. § 3.303 (2016). The appropriations to the LCC also fund the operations of the Revisor of Statutes, the Legislative Auditor, and the Legislative Reference Library. *See* 2017 Minn. Laws 1st Spec. Sess. at 1411–12.

2. The constitution also provides the Governor with general veto power over an entire bill. Minn. Const. art. IV, § 23 (stating that the Governor can "veto[ ] a bill" and "return it with his objections to the house in which it originated"). The Governor used his general

veto power to veto Senate File No. 3, a labor-standards bill that addressed local governments' ability to establish wage and benefit standards at levels higher than provided by statute. The constitutionality of this veto is not before us.

3. The Governor notified the Legislature that he objected to the condition in Senate File No. 1, which made the appropriation to the Department of Revenue effective only upon enactment of House File No. 1. The constitutionality of the Legislature's decision to link the appropriation for the Department of Revenue to the enactment of the tax bill is not before us.

of the Separation-of-Powers clause in the Minnesota Constitution.[4] In counts two and three, the Legislature sought injunctive or mandamus relief directing the Commissioner of the Minnesota Department of Management and Budget (MMB) to allot the funds that were appropriated to the Legislature in Senate File No. 1 for the 2018–2019 biennium. The district court ordered the parties to show cause on whether the case was justiciable and, if so, why the relief sought in the complaint should or should not be ordered. *Ninetieth Minn. State Senate v. Dayton*, No. 62-CV-17-3601, Order at 2 (Ramsey Cty. Dist. Ct. filed June 14, 2017).

On June 23, 2017, the Governor and the Legislature stipulated that count one of the Legislature's complaint, which seeks a declaratory judgment, was ripe for decision. They also asked the district court to enter a temporary injunction directing MMB to "take all steps necessary" to fund the Legislature based on "fiscal year 2017 base general fund funding" during the appeal period—defined as completion of all appellate review and issuance of the appellate court's mandate—or until October 1, 2017, whichever occurred first. They agreed that a decision on counts two and three of the Legislature's complaint could be stayed until our final decision in this matter.

The district court filed an order on the parties' stipulation on June 26, 2017. *Ninetieth Minn. State Senate v. Dayton*, No. 62-CV-17-3601, Order at 1 (Ramsey Cty. Dist. Ct. filed June 26, 2017). The court concluded that count one of the complaint was ripe and that the Legislature had standing to bring the suit. *Id.* at 6. Relying

in part on the temporary funding orders issued by district courts in the Second Judicial District in connection with the government shutdowns in 2001, 2005, and 2011, *id.* at 5, the court concluded that it was authorized to grant the temporary funding agreed to in the parties' stipulation. *Id.* at 7–11 (explaining that notwithstanding the limits on appropriation imposed by Minn. Const. art. XI, § 1, " 'when the traditional processes of government have failed,' 'the rigidity of Article XI' must temporarily yield in favor of the broader constitutional rights of Minnesota's citizenry" (citations omitted)).

On July 19, 2017, the district court filed an order granting the Legislature's requested declaratory judgment on count one. *Ninetieth Minn. State Senate v. Dayton*, No. 62-CV-17-3601, Order at 1 (Ramsey Cty. Dist. Ct. filed July 19, 2017) ("July 19 order"). The court declared the Governor's line-item vetoes null and void as a violation of the Separation-of-Powers clause in Article III because they "impermissibly prevent[ed] the Legislature from exercising its constitutional powers and duties." *Id.* at 3. Reasoning that Article III limits the Governor's veto power, *id.* at 12–13, the court concluded that, by vetoing the appropriations for the Legislature, the Governor's line-item vetoes "both nullified a branch of government and refashioned the line-item veto as a tool to secure the repeal or modification of policy legislation unrelated to the vetoed appropriation," *id.* at 16. The court therefore concluded that the appropriations struck by the Governor's line-item vetoes "became law with the rest of the bill." *Id.* at 3.

---

4. Count one of the Legislature's complaint also suggested a violation of Article IV, Section 23 of the constitution by pleading that, because the vetoed appropriations matched amounts recommended in the Governor's budget for the Legislature, the vetoes failed to satisfy Article IV's requirements for the exercise of that power. This Article IV argument was made by the Legislature both in the district court and before us.

Judgment was entered on the district court's order on July 20, 2017. On July 31, 2017, to resolve a dispute over the level at which the Legislature would be funded during this appeal, the parties entered into a second stipulation. They agreed that "[d]uring the appeal period," MMB would "continue to provide funding to the" Legislature based on its "fiscal year 2017 base general fund funding." Either body of the Legislature could "petition the [district] court for funding" beyond that provided by MMB in the event of "extraordinary and unanticipated expenses." The district court adopted this stipulation by order dated July 31, 2017. *Ninetieth Minn. State Senate v. Dayton*, No. 62-CV-17-3601, Stipulation and Order at 2 (Ramsey Cty. Dist. Ct. filed July 31, 2017).

On July 26, 2017, we granted the Governor's petition for accelerated review. Oral argument was held on August 28, 2017. On September 8, 2017, we ordered the Governor and the Legislature to address the constitutionality of judicially ordered funding for the Legislature, as well as any other potential remedies for vindication of the people's constitutional right to three independent, functioning branches of government. *Ninetieth Minn. State Senate v. Dayton*, 901 N.W.2d 415, 417 (Minn. 2017) (order). We also directed the parties to apprise us of the funds available to the Legislature going forward. *Id.* In response they disclosed that, as of September 1, the House had carryover funds of $10,681,438.14 and the Senate had carryover funds of $6,004,325.94, both from pre-

vious appropriations. They agreed that, given the chambers' combined estimated monthly expenses of $5.2 million and current spending rates, the Senate's funds would be exhausted by December 1, 2017, and the House's funds by February 1, 2018.

We also ordered that the Legislature and the Governor mediate their dispute. *Id.* On September 22, 2017, the parties advised us that mediation had reached an impasse.

On September 25, 2017, the Governor amended his previous statement on the Legislature's funding, to include carryover funds available to the LCC from previous appropriations, in the amount of $3,640,956.91. The Governor also noted in his amended statement that the FY 2018–2019 appropriations to the LCC, which exceed $35 million, would, if used to fund the Legislature's operations, allow the Legislature to continue functioning until "well after the next legislative session begins." The Legislature disagreed with the "numbers presented by the Governor" and noted that the legality of the Legislature's use of the LCC's carryover funds or FY 2018–2019 appropriations was "untested."

In an order filed September 28, 2017, we directed the parties to provide information on the carryover funds and appropriations available to the LCC, and the legal authority that would permit the Legislature to use those funds.[5] *Ninetieth Minn. State Senate v. Dayton*, No. A17-1142, Order at 3-4 (Minn. filed Sept. 28, 2017). In their subsequent disclosures, the parties gener-

---

5. In a separate order also filed on September 28, 2017, we denied the motion of the Association for Government Accountability to intervene, and denied a motion by We the People for leave to file an amicus brief, both as untimely. *Ninetieth Minn. State Senate v. Dayton*, No. A17-1142, Order at 1-2 (Minn. filed Sept. 28, 2017). The motion to intervene raised arguments regarding our subject-mat-

ter jurisdiction over this dispute. Having reviewed those arguments, we conclude that they lack merit. We have subject-matter jurisdiction.

We also deny the Governor's motion, filed on September 20, 2017, to strike portions of the Legislature's informal memorandum filed in response to our September 8 order.

ally agreed on the funds currently available to the Legislature, which consist of funds carried over by the House and Senate from previous appropriations, funds available to the LCC from carried over funds,[6] and the appropriations to the LCC for the current biennium. The parties also generally agreed that, subject to certain statutory requirements, the Legislature has the discretion to use the carryover funds for the House, the Senate, and the LCC, as well as the discretion to use the biennial appropriations to the LCC.

## ANALYSIS

■ The questions raised in this case involve powers the Minnesota Constitution confers on our three branches of government. The interpretation of the constitution is purely legal and thus subject to de novo review. *Star Tribune Co. v. Univ. of Minn. Bd. of Regents*, 683 N.W.2d 274, 283 (Minn. 2004) ("Issues of constitutional interpretation are questions of law which we review de novo.").

### I.

■ We begin with the Governor's line-item veto power, which resides in Article

IV of our state constitution, an article that generally addresses the powers of the Legislative Branch. *See* Minn. Const. art. IV, § 23 ("If a bill presented to the governor contains several items of appropriation of money, he may veto one or more of the items while approving the bill."). Because it is located in the constitutional article that confers legislative powers, we have "narrowly construed" the Executive's line-item veto power "to prevent an unwarranted usurpation by the executive of powers granted" to the Legislature.[7] *Inter Faculty Org. v. Carlson*, 478 N.W.2d 192, 194 (Minn. 1991).

In our September 8 interim order, we stated that the Governor's exercise of the power to veto items of the Legislature's appropriations for itself did not violate the plain language of Article IV, Section 23 of the Minnesota Constitution. 901 N.W.2d at 415–16. We explain that conclusion today.

■ The plain language of Article IV places only one substantive limit on the line-item veto power, specifically, the requirement that the veto be made as to an "item" of "appropriation." Minn. Const. art. IV, § 23.[8] *See State ex rel. Gardner v.*

---

**6.** The parties reported in this latest disclosure that the LCC's carryover fund balance increased slightly, to approximately $3.8 million, based on updated calculations.

**7.** Until the Minnesota Constitution was amended in 1974, a corollary provision existed in Article V, which identifies the Executive's powers. *See* Minn. Const. of 1857, art. V, § 4 (providing the Executive with "a negative upon all laws passed by the legislature, under such rules and limitations as are in this constitution prescribed"). This separate Executive authority to issue a "negative" on legislation was deleted when the constitution was amended in 1974. Act of Apr. 10, 1974, ch. 409, § 1, 1974 Minn. Laws 787, 797 (showing proposed amendment, ultimately passed by voters, to strike this sentence from Article V). The 1974 amendments were stylistic, not substantive. *City of Golden Valley v. Wiebesick*,

899 N.W.2d 152, 159 (Minn. 2017) (explaining that the 1974 amendments to the constitution were intended to make the document "more readable and stylistically correct" (citation omitted) (internal quotation marks omitted)).

**8.** Relying on the language of the line-item veto provision as adopted in 1876, the Legislature contends that the Governor must also "object" to a specific appropriation in addition to identifying the item vetoed. *See Inter Faculty Org.*, 478 N.W.2d at 194 & n.2 (allowing the Governor to "object" to "items of appropriation" by providing the Legislature with a "statement of the items to which [the Governor] objects" (quoting Minn. Const. of 1857, art. IV, § 11 (as amended))). The Legislature points to no authority that construed the line-item veto provision, before the 1974

*Holm,* 241 Minn. 125, 62 N.W.2d 52, 55 (1954) ("[W]here the language used is clear, explicit, and unambiguous ... and free from obscurity, the courts must give it the ordinary meaning of the words used."). *See also Inter Faculty Org.,* 478 N.W.2d at 194 & n.2 (explaining that the line-item veto power is "a negative authority, not a creative one" because the power is only "to strike" and the power can be exercised only to "delete a specific itemic component or the whole of an appropriation"). Accordingly, we have said that our "focus" is on whether the Governor "has vetoed 'an item of appropriation of money.'" *Johnson v. Carlson,* 507 N.W.2d 232, 235 (Minn. 1993). And "an item of appropriation of money" is "a separate and identifiable sum of money appropriated from the general fund dedicated to a specific purpose." *Inter Faculty Org.,* 478 N.W.2d at 195.[9] We do not "judge the wisdom of a veto, or the motives behind it"; we ask only whether "the veto meets the constitutional test." *Johnson,* 507 N.W.2d at 235; *see also Duxbury v. Donovan,* 272 Minn. 424, 138 N.W.2d 692, 704 (1965) (declining to "intimate one way or another" whether "the use of the veto in this particular case was or was not prudent").

The district court found that the Governor's line-item vetoes were applied to an "item of appropriation"—the sums listed in lines 24–25 on page 2 of Senate File No. 1—and those sums were "dedicated to a specific purpose," funding the Senate and the House in the 2018–2019 biennium. We agree. The line-item vetoes therefore comply with Article IV, Section 23.

Whether it was wise for the people of Minnesota in 1876 to provide for a veto

power over items of appropriations, in language that does not expressly exclude the appropriations for a coordinate branch of government, is not for us to judge. We must follow the plain language of Article IV, Section 23. *See, e.g., State ex rel. Gardner,* 62 N.W.2d at 63 (noting, based on the plain language of the constitution, that "the governor clearly has the right to veto any bill appropriating money"); *see also People ex rel. Millner v. Russel,* 311 Ill. 96, 142 N.E. 537, 538 (1924) (explaining that the Governor's veto authority is "direct, plain, and affords no basis for the construction that ... appropriations for salaries of officers of the state government were intended to be excepted" even though "the Governor ... clothed with such power ... might veto appropriations ... and thereby suspend the operation of any or all departments of the state government"). Had the framers of the Minnesota Constitution and the people of Minnesota wished to exclude any branch, officer, or agency from the scope of the Governor's veto power, they could have done so. They did not. *See State ex rel. Putnam v. Holm,* 172 Minn. 162, 215 N.W. 200, 202 (1927) ("Unambiguous words need no interpretation ... [w]e are not empowered to say that [the framers] meant something they did not say.").

Based on this analysis, we hold that the Governor's line-item vetoes of the Legislature's biennial budget appropriations did not violate Article IV, Section 23 of the Minnesota Constitution.

II.

Having concluded that the Governor's line-item vetoes did not violate Article IV,

---

amendments to the constitution, to require *both* a veto and an objection. In this case, the Governor vetoed the appropriations and thereby objected to them. Accordingly, we reject the Legislature's argument.

**9.** *See* Minn. Stat. § 16A.011, subd. 4 (2016) ("'Appropriation' means an authorization by law to expend or encumber an amount in the treasury.").

Section 23 of the Minnesota Constitution, we next consider whether those vetoes nonetheless violate Article III of the Minnesota Constitution. The separation-of-powers principle is embodied in Article III, which states:

> The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except in the instances expressly provided in this constitution.

Minn. Const. art. III, § 1.

The Legislature contends, and the district court concluded, that the Governor's line-item vetoes violate Article III for two reasons. First, the Legislature argues that the vetoes violate Article III because the exercise of the veto power over the Legislature's appropriations for the House and Senate effectively abolished the Legislature by depriving it of the funding needed to perform "constitutionally mandated core functions." The Legislature explains that the monthly expenses for the House and Senate, together, are approximately $5.2 million, which were intended to be funded by the vetoed appropriations. The Legislature points out that it will not have another opportunity to appropriate funding until it reconvenes in February 2018. Second, the Legislature argues that the vetoes violate Article III because they are unconstitutionally coercive. We consider each aspect of the Article III issue in turn.

**A.**

We turn first to the question of whether the line-item vetoes violate Article III because the vetoes effectively eliminated the Legislative Branch. The district court concluded that the Governor's line-item vetoes "effectively abolished" and "nullified" the Legislature by depriving it of the funding needed to perform its core functions. July 19 order at 15–16. Even taking into account the carryover funds from previous appropriations to the House and Senate, the district court concluded that legislative operations would cease well before the Legislature reconvenes in February 2018. *Id.* at 15 n.4.

On appeal, the Governor contends that his vetoes did not effectively abolish the Legislature, for two reasons. First, the Governor argues that the exercise of the constitutional line-item veto power cannot abolish a constitutional body because the Judiciary has the authority to provide "core function funding to preserve the existence of a constitutional body." This approach has been used in past funding disputes between the Executive and Legislative Branches, the Governor notes, with the Judiciary authorizing funding as needed for the "critical, core functions" of a constitutional body. Second, the Governor contends that the Legislature has appropriated funds available to it that will sustain the Legislature well into 2018.[10]

**1.**

We begin with the Governor's argument that the Judiciary can order

---

**10.** The Governor also asserted in his informal memorandum filed in response to our September 8 order that the Executive has the authority to fund the Legislature's core functions. We disagree. We explained in *Brayton v. Pawlenty* that the Legislature and the Governor must work together in the budget process, but the Executive's constitutional powers in the legislative budget process are limited to approval and veto powers. 781 N.W.2d 357, 365 (Minn. 2010). We are unaware of any constitutional authority that allows the Governor to authorize funding for the Legislative Branch in the absence of an appropriation.

funding for the Legislature as needed to perform its core functions. The Governor acknowledges that the Judiciary does not have the power to appropriate, but contends that we nonetheless have the implied power, under Article I of the Minnesota Constitution, to authorize funding for the Legislature to vindicate the constitutional rights of Minnesota's citizens.[11] We disagree.

■ The language of Article XI, Section 1 of the Minnesota Constitution is unambiguous: "No money shall be paid out of the treasury of this state except in pursuance of an appropriation by law." The purpose of this provision in Article XI is "to prevent the expenditure of the people's money without their consent first had and given." *State ex rel. Nelson v. Iverson*, 125 Minn. 67, 145 N.W. 607, 608 (1914).

In the face of this unambiguous language, we have declined to order funding, even in circumstances where constitutional rights are at stake. *See, e.g., State v. Dahlgren*, 259 Minn. 307, 107 N.W.2d 299, 303–04 (1961) (acknowledging that a person charged with committing a crime "is con-

stitutionally entitled to the advice and assistance of counsel" but stating that we have "no power to appropriate money to compensate such counsel" and concluding that "[o]nly the legislature can do that"); *State ex rel. Chase v. Preus*, 147 Minn. 125, 179 N.W. 725, 726 (1920) ("The mere creation of the liability on the part of the state ... is of no force, in the absence of an appropriation of funds from which the liability may be discharged.").[12] The only conclusion we can draw from the plain language of the constitution and these decisions is that Article XI, Section 1 of the Minnesota Constitution does not permit judicially ordered funding for the Legislative Branch in the absence of an appropriation.

2.

■ Next, we consider whether, in the absence of judicial funding, the Legislature has been "effectively abolished." The district court reasoned that the Governor's line-item vetoes abolished the Legislature because the evidence showed that, but for the parties' stipulation that allowed MMB

---

11. Our decision in *In re Clerk of Court's Compensation for Lyon County v. Lyon County Commissioners,* on which the Governor relies, did not address the constitutionality, under Article XI of the Minnesota Constitution, of judicially ordered funding for the Legislative Branch of government. 308 Minn. 172, 241 N.W.2d 781 (1976). Thus, that decision is of limited help here.

12. These decisions are consistent with those by other states that have addressed similar constitutional language. *See, e.g., Wallace v. Baker*, 336 So.2d 156, 156 (Ala. 1976) (holding that the state constitution "specifically prohibits the payment out of the treasury of money" except by an appropriation passed by the legislature); *Rios v. Symington*, 172 Ariz. 3, 833 P.2d 20, 23 (1992) (explaining that "ordinarily public funds may be expended only by legislative authority"); *Stevens v. Geduldig*, 42 Cal.3d 24, 227 Cal.Rptr. 405, 719 P.2d 1001, 1012 (1986) (explaining that the

appropriations provision in California's constitution "embod[ies] a fundamental and time-honored principle of representative government" and ensures that "decisions about the allocation of public funds will be made through the legislative appropriation process"); *Chiles v. Children A, B, C, D, E, & F*, 589 So.2d 260, 265 (Fla. 1991) (stating that Florida courts have "long held that the power to appropriate state funds is legislative"); *Fletcher v. Commonwealth*, 163 S.W.3d 852, 863 (Ky. 2005) (explaining that the court has "consistently held that" Kentucky's appropriations provision "means exactly what it says," namely, that the " 'raising and expenditure of the money necessary to operate state government' " is a legislative function (quoting *Commonwealth ex rel. Armstrong v. Collins*, 709 S.W.2d 437, 441 (Ky. 1986))); *Colbert v. State*, 86 Miss. 769, 39 So. 65, 66 (1905) ("[T]he control of the purse strings of government is a legislative function.").

to provide funding to the Legislature during this proceeding, the Legislature would have ceased operations by July 27, 2017 (Senate) and September 1, 2017 (House). In reaching this conclusion, the district court did not consider the availability of the FY 2018–2019 appropriations to the LCC, and there was no evidence in the record before the district court regarding the LCC's carryover funds from previous appropriations.

■ As a matter of law, the Legislature remains in existence between sessions. *See State v. Hoppe*, 298 Minn. 386, 215 N.W.2d 797, 804 (1974) (explaining that "despite temporary and interim adjournments the legislature is in existence until the final adjournment of its biennial regular session"); *see also The Pocket Veto Case*, 279 U.S. 655, 681, 49 S.Ct. 463, 73 L.Ed. 894 (1929) (noting that "the legislative existence" of Congress is not terminated by an adjournment between sessions). The factual question this case presents is whether the Legislature has the funding needed to exercise its constitutional duties on behalf of Minnesota's citizens while it is in an interim adjournment and until it reconvenes. We conclude that it does.

The Legislature adjourned the regular session until February 20, 2018 and adjourned the special session *sine die*. The parties agree that, during the interim adjournment, the monthly expenses for the House and Senate are approximately $5.2 million. Until at least October 1, the Legislature has not needed to access its carryover funds to pay interim expenses because the parties' stipulations, as adopted by the district court, provided for funding through MMB. After October 1 then, the Legislature requires approximately $26 million to fund its interim expenses through February 2018.[13]

We asked the parties to explain all funding sources available to the Legislature to pay interim expenses. The Legislature's most recent submission explained that funds are available to it from the following sources: (1) approximately $16,263,488 in carryover funds from previous appropriations to the House and Senate; (2) approximately $3,466,493 in unencumbered carryover funds from previous appropriations to the LCC; and (3) after deducting encumbered and assumed employee compensation for the biennium, approximately $6,920,000 in appropriated funds to the LCC.[14]

13. The parties' stipulated funding agreement allowed the Senate to use carryover funds for Senate Office Building expenses, but the agreement did not otherwise require the Legislature to access any available carryover or appropriated biennial funds. The parties tell us that the district court's July 31 temporary funding order expired on October 1, and the Legislature is "not obligated to refund amounts expended" during the litigation under the temporary funding orders. Thus, in calculating the Legislature's remaining funding needs, we have used the agreed-upon monthly expenses to calculate an estimate of the Legislature's funding needs beginning on October 1, 2017.

14. The funds available to the Legislature from the LCC biennial appropriations, $35,192,000, can be calculated two ways. First, in its October 5 memorandum, the Legislature explained that $14,072,000 from the LCC's FY 2018 appropriation has already been encumbered for FY 2018 employee compensation. Assuming that at least the same amount will be encumbered at the appropriate time for FY 2019 employee compensation, the net amount available to the Legislature from the LCC's biennial appropriations, after taking the entirety of the biennial employee compensation into account, is $6,920,000. Second, the amounts allocated to the Legislative Auditor, the Revisor of Statutes, and the Legislative Reference Library, *see* 2017 Minn. Laws 1st Spec. Sess. at 1412, can be excluded from the LCC's biennial appropriations, leaving a net sum of $6,284,000 available to the Legislature. Using either calculation, as we

Based on the parties' submissions after oral argument in this case, we conclude that the Legislature currently has access to at least $26 million, and, should the Legislature choose, up to $40 million, in appropriated, unencumbered, funds.[15] We reach this conclusion because: the House and Senate have carryover funds available from previous appropriations; the Legislature can access carryover funds available to the LCC from previous appropriations; and the Legislature can access portions of the FY 2018–2019 appropriations to the LCC. The Legislature therefore has access to sufficient funds to sustain its operations until it reconvenes in February 2018.

Further, we conclude that the Legislature has the necessary statutory authority to use these funds if it chooses to do so. Specifically, the Legislature can carry over funds appropriated in one biennium into the next biennium, which can be used "to pay expenses associated with . . . interim activities. . . ." Minn. Stat. § 16A.281 (2016) ("Balances may be carried forward into next biennium"). In addition, the LCC, which also holds carryover funds and has appropriated funds available for this biennium, "may transfer unobligated balances among general fund appropriations to the legislature." Minn. Stat. § 3.305, subd. 2 (2016). Finally, "[a]n appropriation made to the legislature . . . for all or part of a biennium may be spent in either year of the biennium." Minn. Stat. § 16A.281.

The Legislature agrees that it can access these carryover and appropriated funds, but contends that the decision to do so rests within its sole discretion. We agree. The relevant statutes, discussed above, are framed in permissive terms. See Minn. Stat. § 3.305, subd. 2 (stating that the LCC "may transfer unobligated balances"); Minn. Stat. § 16A.281 (stating that the Legislature "may" spend appropriations in "either year of the biennium"). The permissive term "may" confers discretion on the Legislature to transfer or expend the available funds, and we cannot, in the circumstances of this case, compel those decisions. See, e.g., State ex rel. Klimek v. Sch. Dist. No. 70, 204 Minn. 279, 283 N.W. 397, 398 (1939) (explaining that a statute that uses the term "may" is "permissive and imports the exercise of discretion"). The fact remains, however, that the Legislature has funding available to it that maintains its existence as an independent branch of government and enables it to perform its constitutional responsibilities on behalf of Minnesota's citizens until it reconvenes in regular session in February 2018. Whether it chooses to use that funding to do so is for the Legislature, not the Judiciary, to decide.

Although the constitution does not enable the Judiciary to order funding for the Legislature in the absence of an appropriation, we conclude that the Legislature has not been effectively abolished by virtue of the Governor's line-item vetoes because it has sufficient funds available to sustain it as an independent, functioning branch of state government until it convenes again in regular session. Thus, in the circumstances

explain below, the Legislature has access to at least $26 million in appropriated, unencumbered, funds.

15. The Legislature stated in its latest submission that $14,072,000 in funds from the LCC's biennial appropriations have already been encumbered for employee compensation in FY 2018, but no employee-compensation funds have been encumbered for FY 2019, which

explains the range between $26 million and $40 million. Other appropriated funds have also been encumbered, dedicated for specific purposes, or otherwise are restricted in use, see, e.g., Minn. Const. art. XI, §§ 14–15. We excluded specific amounts that the Legislature identified as encumbered, dedicated, or restricted, but how the Legislature chooses to spend the remaining funds is left to its discretion.

of this case, we hold that the Governor's vetoes did not violate Article III by effectively abolishing the Legislature.

### B.

 Finally, we turn to the Legislature's argument that the Governor's line-item vetoes violated Article III of the Minnesota Constitution because he exercised that power to achieve an unconstitutional result. Specifically, the Legislature contends that the Governor announced that he vetoed the biennial appropriations for the House and Senate to bring legislative leaders "back to the table to negotiate provisions" in enacted laws. Doing so, the Legislature contends, uses the veto power to "coerce" the Legislature into legislating. The district court agreed, concluding that the Governor's line-item vetoes violated the Separation-of-Powers clause because the Governor's exercise of that power was used in an attempt to "gain a repeal or modification of unrelated policy legislation." July 19 Order at 22.

The Governor disagrees because, he contends, the line-item veto power is an express exception to the separation of powers. *See* Minn. Const. art. III, § 1 (prohibiting the "exercise of any of the powers properly belonging" to the other branches of government "except in the instances expressly provided in this constitution"). Further, he argues, the Legislature's intent-based inquiry into the motives for exercising the line-item veto power is inconsistent with the plain language of Article IV, Section 23 of the constitution.

 We have not previously considered how the Executive's line-item veto power fits within the separation-of-powers principles embodied in Article III. *See*

*State v. Bates*, 96 Minn. 110, 104 N.W. 709, 712 (1905) (noting the "unwarranted assumption that all functions of government must necessarily be either executive, legislative, or judicial"). And, although the Judiciary is responsible for determining when the separation of powers among our three branches of government has been violated, we exercise restraint when presented with "a possible separation of powers conflict between the branches." *See State v. S.L.H.*, 755 N.W.2d 271, 278 (Minn. 2008) (explaining, in refusing to exercise inherent judicial authority to order expungement of non-judicial branch records, that "our separation of powers jurisprudence requires that we give 'due consideration' to the 'equally important executive and legislative functions' " (citations omitted)). We are presented with just such a conflict here.

The impasse that led the parties to the courtroom stems from disputes that are ill-suited for judicial resolution. The Legislature asserts that the Governor improperly vetoed its biennial appropriations in an effort to coerce concessions on tax and policy provisions. The Governor counters that his line-item veto power was the only tool he could use to respond to the Legislature's conditional appropriation of funding for the Department of Revenue, which he argues was intended to coerce his agreement to the tax and policy provisions. Although these arguments are cast in the framework of constitutional principles and powers, the parties' dispute about coercion essentially asks the court to assess, weigh, and judge the motives of co-equal branches of government engaged in a quintessentially political process. *See In re McConaughy*, 106 Minn. 392, 119 N.W. 408, 417 (1909) ("Many questions arise which are clearly political, and not of judicial cognizance."). Indeed, this case, unprecedented

in the history of Minnesota,[16] essentially asks the Judiciary to choose between the Governor and the Legislature. Specifically, the parties' arguments and positions envision that we conclude either that the Legislature's constitutional power to legislate prevails over the Governor's constitutional power to veto items of appropriation, or that the Governor's line-item veto power prevails over the Legislature's power to legislate.

■ But our constitution does not require that the Judicial Branch referee political disputes between our co-equal branches of government over appropriations and statewide policy decisions when those branches have both an obligation and an opportunity to resolve those disputes between themselves. *See State ex rel. Burnquist v. Dist. Court*, 141 Minn. 1, 168 N.W. 634, 636 (1918) (explaining that the Judiciary "has not the power to control, coerce, or restrain the action of the other two [branches] within the sphere allotted them by the Constitution wherein to exercise judgment and discretion"); *In re McConaughy*, 119 N.W. at 417 (explaining that the discretionary constitutional powers held by the Executive and Legislative Branches are not subject to judicial control "not merely because they involve political questions, but because they are matters which the people have by the Constitution delegated to" those branches). Moreover, our precedent counsels that we avoid reaching constitutional questions if there is another way to resolve the case. *See State*

*v. Irby*, 848 N.W.2d 515, 521 (Minn. 2014) (noting that we will construe statutes to avoid a constitutional confrontation, including "to avoid potential separation of powers problems"); *In re Senty-Haugen*, 583 N.W.2d 266, 269 n.3 (Minn. 1998) ("It is well-settled law that courts should not reach constitutional issues if matters can be resolved otherwise.").

Here, the way to resolve the parties' dispute is through the usual political process of appropriations. The constitution textually obligates the Governor and the Legislature to set the budget for our State. *See* Minn. Const. art. IV. And, based on the record now before us and our analysis above, the other Branches have the opportunity to resolve this dispute when the Legislature reconvenes on February 20, 2018. If the Legislature were unable to continue its usual operations until it reconvened in February, we would be presented with a different situation. But here, the Legislature, based on its own estimates of its ongoing expenses, and our analysis of the amount of funds available for the Legislature's use in its sole discretion, can operate until it reconvenes. Whether the Legislature should use those funds is not for us to decide. The point is, the Legislature has sufficient funding to continue to perform its functions independently until it reconvenes. Once it reconvenes, the Legislature can pass additional appropriations for itself without adhering to the conditions the Governor set in his veto message, and the respective powers available to the

---

**16.** The Legislature invoked our original jurisdiction in *Seventy-Seventh Minn. State Senate v. Carlson*, 472 N.W.2d 99 (Minn. 1991), to challenge "the effectiveness of attempted vetoes by the Governor." *Id.* We did not reach the merits of the challenge to Governor Carlson's vetoes, but dismissed the Legislature's petition in order to allow it to recommence a declaratory judgment action in the district court. *Id.* at 99–100. Ultimately, the Legisla-

ture did not do so. *See Inter Faculty Org.*, 478 N.W.2d at 193. Other disputes between the Executive and Legislative Branches of our state government have been in cases brought by one or more members of the Legislative Branch against one or more members of the Executive Branch *See, e.g., Limmer v. Ritchie*, 819 N.W.2d 622 (Minn. 2012); *Limmer v. Swanson*, 806 N.W.2d 838 (Minn. 2011).

branches under Article IV can be exercised.[17]

■ It is the "province and duty" of the Judiciary to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), but on this occasion, principles of judicial restraint dictate that we defer to the constitutional remedies that are available to the other branches. *See, e.g., Limmer v. Swanson*, 806 N.W.2d 838, 841 (Minn. 2011) (Anderson, Paul J., concurring) (explaining that there are occasions in which the judiciary must "stand down" in order to allow the other branches of government to "attempt to resolve a particular issue"). *See also Bennett v. Napolitano*, 206 Ariz. 520, 81 P.3d 311, 318–19 (2003) (stating that the court was "reluctant to become the referee of a political dispute" and noting that if the Legislature had accessed a veto-override remedy it would have alleviated judicial concern about prematurely entering "the political arena"). Particularly in the context of a dispute that has its origins in policy decisions on state spending priorities and fiscal stability, we must be wary of unnecessary judicial interference in the political process. *See Limmer*, 806 N.W.2d at 839 ("Resolution of . . . budget issues by the other branches through the political process is preferable to our issuance of an advisory opinion adjudicating separation of powers issues that are not currently active and may not arise in the future.").[18]

■ Our decision today should not be read to foreclose the possibility of a judicial remedy in a different situation. As we said in our order of September 8, 2017, Minnesotans have a constitutional right to three independent branches of government, each functioning at a level sufficient to allow the exercise of the constitutional powers committed to each branch for the "security, benefit and protection of the people, in whom all political power is inherent." Minn. Const. art. I, § 1; *see* 901 N.W.2d at 416. We conclude that, given the respect the Judiciary owes to our coordinate branches, *see League of Women Voters Minn. v. Ritchie*, 819 N.W.2d 636, 651 (Minn. 2012), and the detailed, specific tools provided by our constitution to resolve political disputes, it would be unwise for us to intervene here. We trust that, going forward, each branch of government will seek to avoid a constitutional stalemate by exercising its powers to promote the constitutional cooperation that Minnesotans expect and deserve.

## CONCLUSION

For the foregoing reasons, we hold that the Governor's line-item vetoes of the Legislature's appropriations to itself were constitutional under Article IV, section 23 of the Minnesota Constitution. As to Article III, we conclude that, although the constitution does not allow the Judiciary to order funding for the Legislative Branch in the absence of an appropriation, the record establishes that the Legislature has funding to sustain it until it reconvenes in regular session. We therefore reverse the district court's decision to the extent that it holds the Governor's line-item vetoes violated Article III of the Minnesota Constitution by effectively abolishing the Legislature. Finally, we conclude that principles of judicial restraint and respect for

---

**17.** At oral argument, the Legislature conceded that the Governor could constitutionally exercise the line-item veto power over the Legislature's appropriations while the Legislature is in session.

**18.** The dissent opines that, in the upcoming session, an appropriation for the Legislature may be vetoed and is "exceptionally unlikely" to be overridden. We decline to speculate about the session or assume that the Article IV process will be ineffective.

our coordinate branches of government dictate that we refrain from deciding whether the Governor's exercise of the line-item veto power over the Legislature's appropriations to itself violated Article III by unconstitutionally coercing the Legislature. We therefore vacate that part of the district court's decision.

Given that our decision on count one of the Legislature's complaint renders the relief requested under counts two and three moot, we remand to the district court to dismiss the case in its entirety.

Reversed in part, vacated in part, and remanded.

STRAS, J., took no part in the consideration or decision of this case.

Dissenting, Anderson, J.

ANDERSON, Justice (dissenting).

## DISSENT

I agree that, in the absence of an appropriation, a judicial order that authorizes funding for the Legislative Branch is unconstitutional. I also agree that the plain language of Article IV, Section 23 of the Minnesota Constitution gives a governor textual authority to line-item veto appropriations for the Legislature. But I conclude that this is not the occasion for judicial restraint and that the Governor's line-item vetoes of the appropriations passed by the Legislature to fund the House and Senate violate Article III of the Minnesota Constitution. I would hold, therefore, that

the Governor's line-item vetoes are unconstitutional and were unconstitutional at the moment the vetoes occurred.

## I.

As an initial matter, it is helpful to discuss the points on which the court and I agree. I agree with the court's conclusion that a judicial order that authorizes funding for the Legislative Branch, in the absence of an appropriation, is unconstitutional. The court must resolve this issue because the Governor has defended his line-item vetoes, in part, by arguing that the Legislature has a judicial remedy: the ability to seek a court order to fund the core functions of its branch. The Governor's proposed remedy is unmistakably contrary to the plain text of our constitution, the precedent of our court, and centuries of jurisprudence.

The court thoroughly examines the constitutional language and our decisions that support the conclusion that "core funding" judicial orders are not constitutionally permissible. Further discussion of those matters is not necessary here. But it is worth noting that the Judiciary has never been thought to have the general power of the purse. That principle extends at least from the time of the Magna Carta (1215)[1] through the English Bill of Rights (1689)[2] to the revolutionary era concern about "no taxation without representation."[3] These bedrock principles resulted in Article I,

---

1. "No 'scutage' or other 'aid' may be levied in our kingdom without its general consent...." G.R.C. Davis, *Magna Carta* 18 (1963) (Article 12). "To obtain the general consent of the realm for the assessment of an 'aid'—except in the three cases specified above—or a 'scutage', we will cause the archbishops, bishops, abbots, earls, and greater barons to be summoned...." *Id.* at 19 (Article 14).

2. "That levying money for or to the use of the Crown by pretence of prerogative, without grant of Parliament, for longer time, or in other manner than the same is or shall be granted, is illegal...." The Bill of Rights, 1 W. & M., sess. 2, c. 2 (1689).

3. *E.g.*, Benjamin W. Labaree, *Boston Tea Party*, in The Oxford Companion to United States History 84 (Paul S. Boyer ed., 2001).

Section 9 of the U.S. Constitution[4] and, finally, led our framers to adopt the language found in Article XI, Section 1 of the Minnesota Constitution.[5] Our framers plainly vested the powers to tax and spend in the branch closest to the people, the Legislature. *See* Minn. Const. arts. X–XI. The court correctly concludes that judicial orders that authorize funding for the Legislative Branch are not permitted by the Minnesota Constitution.

The court also explains its earlier holding that the Governor's line-item vetoes of the Legislature's biennial appropriations for itself complied with the plain language of Article IV, Section 23 of the Minnesota Constitution. *Ninetieth Minn. State Senate v. Dayton*, 901 N.W.2d 415, 415–16 (Minn. 2017) (order). I agree. The text of Article IV, Section 23 does not expressly exclude the exercise of the line-item veto power over legislative appropriations. Where I diverge from the court's opinion is in its decision to refrain from addressing the separation-of-powers dispute this case presents and in my analysis of Article III and the Separation of Powers enshrined in our constitution.

## II.

I would hold that the Governor's line-item vetoes of the entire biennial appropriations of funding for the House and Senate (collectively, the Legislature) were unconstitutional acts that violated the Separation of Powers guaranteed by Article III of the Minnesota Constitution. The court chooses a different path, one of judicial restraint that leads it to decline to decide whether the Governor's exercise of his line-item veto power violated Article III of the Minnesota Constitution because that power was used to unconstitutionally coerce the Legislature. I do not quarrel with the court's discussion of the principles of judicial restraint, only with the application of those principles here.

The judicial practice of avoiding interference in disputes between the two other branches of government has a history in our country that extends from the early interpretations of the U.S. Constitution to the present day. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803) ("Questions, in their nature political ... can never be made in this court."); *see also United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 634–35, 4 L.Ed. 471 (1818) (explaining that the conduct of foreign affairs is not a legal matter but a political matter committed to the executive and legislative branches); *Doe v. Bush*, 323 F.3d 133, 141 (1st Cir. 2003) (describing the interaction of the political-question doctrine with conflicts between the Legislative and Executive Branches concerning the distribution of constitutional authority). But courts have also recognized that judicial action is appropriate when deciding "whether the action of [a] branch exceeds [its] authority." *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). This is because each branch of government is given its own powers, the powers given have a constitutionally limited scope, and it is always the "province and duty" of the Judiciary to "say what the law is." *Marbury*, 5 U.S. at 177. If the Judiciary could not address disputes between the other two branches of government over constitutional limits, our well-established notions of balance would perish. *See Glass v. Sloop Betsey*, 3 U.S. (3 Dall.) 6, 13, 1

---

4. U.S. Const., art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law....").

5. Minn. Const. art. XI, § 1 ("No money shall be paid out of the treasury of this state except in pursuance of an appropriation by law.").

L.Ed. 485 (1794) (explaining that when "either branch of the government usurps" the powers of the other, "liberty ends, and tyranny commences"); *see also Zivotofsky v. Kerry,* —— U.S. ——, 135 S.Ct. 2076, 2094, 192 L.Ed.2d 83 (2015) (holding that the President has the exclusive right to "recognize or decline to recognize a foreign state and its territorial bounds"); *U.S. House of Representatives v. Burwell,* 185 F.Supp.3d 165, 168–69, 188–89 (D.D.C. 2016) (finding that payments made by the Secretary of Health and Human Services were unconstitutional because no appropriation was made for the payments).

Given the unique circumstances here, the choice of restraint or resolution is hardly free from doubt; in the end, for reasons found in both our history and our jurisprudence, I conclude that the better approach is for the Judiciary to resolve this dispute.

I also conclude that this dispute between our political branches is not so unusual, as the court concludes, that we must stand down. Concerns about executive overreach are neither a recent development nor unique to the current dispute. Our Declaration of Independence from Great Britain tells a "candid world" that "the History of the present King of Great Britain is a History of repeated Injuries and Usurpations, all having in direct Object the Establishment of an absolute Tyranny over these States," and then proceeds to list those "injuries and usurpations" in detail. *The Declaration of Independence* paras. 2–27 (U.S. 1776). Nor were those concerns unique to 1776. Over 100 years earlier, King James I insisted that he had powers not subject to law in the form of an "absolute prerogative." Philip Hamburger, *Is Administrative Law Unlawful?* 28–29 (2014).

These concerns persist today, and the Judiciary has a role to play in resolving these disputes. Our federal courts have faced, and resolved, claims of executive overreach. Well-known examples include a judicial rejection of President Truman's claim of authority to seize steel mills, *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 589, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), and a judicial rejection of war-powers claims by President George W. Bush, *Hamdi v. Rumsfeld,* 542 U.S. 507, 535–36, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004).

It is also worth noting that there is an unstated assumption that underlies the court's opinion—that all legislative sessions are created equal. Under this view, and consistent with judicial restraint, it is better to allow the normal give and take of a legislative session to resume than to have our court step into and resolve this dispute between the branches of government. But all legislative sessions are not created equal. Budgeting for this biennium is complete. In this context, the Governor's action leaves the Legislature with "no real option but to acquiesce." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 582, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). The court assumes that all will be resolved in February, with the start of a new legislative session. But the start of a new legislative session is not a sure-fire safety valve. Assuming the Legislature can open the next session without appropriations, if the Legislature simply enacts appropriations, those new appropriations are potentially the subject of yet another veto action, and line-item vetoes are exceptionally unlikely to be overridden.[6] Had the Gover-

---

6. The Legislature rarely overrides a line-item veto. Although available records from the Minnesota Legislative Reference Library are incomplete, since the adoption of the power in 1876, out of the total recorded 678 line-item vetoes, the Legislature has attempted an

nor exercised his line-item veto power during the legislative session, when the appropriation process occurs, as opposed to after the Legislature adjourned, judicial restraint might well be a wise response. But failing to act here permanently tilts the balance of powers in favor of the Executive. In these circumstances, I cannot agree that judicial restraint is the wise course.

Finally, although there is much to commend in the court's exercise of judicial restraint, I ultimately conclude that not to decide is to decide. No matter what course is taken here, any decision, one way or another, will affect the relative balance of powers between the Legislative and Executive Branches of our government.

It is our principal duty "to say what the law is." *Marbury*, 5 U.S. at 177. Although I would prefer that we not have to act, I conclude that we must. Thus, I turn next to the issue presented by this case: whether the Governor's exercise of his line-item veto power in this instance violated Article III of the Minnesota Constitution.

### III.

Article III of the Minnesota Constitution sets out the separation of powers among the branches of our state government:

The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.

Minn. Const. art. III, § 1. As we explained in *State ex rel. Patterson v. Bates*, this provision includes three elements: a distributive clause that identifies the three branches; a prohibitive clause that prevents one branch from exercising the powers of another branch; and an exceptions clause, which allows one branch to exercise another type of power when the constitution expressly provides for it. 96 Minn. 110, 104 N.W. 709, 712 (1905). Together, these clauses create not merely a separation of functions, but also, importantly, a balance of powers among the branches of our government.

Although conceptually we have described this constitutional provision as establishing a separation of powers, as framed, this provision also includes within it the concept that the powers are distributed to three separate branches of government "to create a system of checks and balances." *Id.* Thus, the three clauses of this provision work together to create a balance among the three branches: each branch has areas of autonomy and also has available certain tools to check another branch from exceeding its power. A proper balance of powers among the branches is what secures the separation of those powers. The separation of powers "operates on a horizontal axis to secure a proper balance of legislative, executive, and judicial authority." *Clinton v. City of New York*, 524 U.S. 417, 452, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Kennedy, J., concurring); *accord Murphy v. Townley*, 67 N.D. 560, 274 N.W. 857, 860 (1937) (recounting

override only 18 times, and only four have succeeded—less than 1 percent. *See generally* Joel Michael, Research Dept., Minn. House of Representatives, *History of the Item Veto in Minnesota* 17–18 (Sept. 2016). The successful overrides came in 2000, after the Governor line-item vetoed eight items of appropriation.

The Legislature overrode four of the eight line-item vetoes. *Id.* Those four overrides all occurred during a historically unusual period where one party controlled the Executive Branch, one party controlled the House of Representatives, and one party controlled the Senate.

the historical development of "a balance of powers between coequal departments of government"); *State ex rel. Britt v. Bd. of Cty. Comm'rs*, 18 Ohio St.3d 1, 480 N.E.2d 77, 79 (1985) (describing "the constitutionally mandated balance of powers"); *Commonwealth v. Nat'l Gettysburg Battlefield Tower, Inc.*, 454 Pa. 193, 311 A.2d 588, 593 (1973) (deciding how power granted to the commonwealth is shared equally among the branches to maintain a "balance of powers"); *Gabler v. Crime Victims Rights Bd.*, 376 Wis.2d 147, 897 N.W.2d 384, 398 (2017) (noting that "the balance of powers tips" when the legislative branch arrogates judicial power).

In several decisions, we have addressed aspects of the separation of powers that are relevant to the present dispute. We have explained that the constitutional separation of powers into three distinct departments, Legislative, Executive, and Judicial, forbids interference by one branch in the spheres of power allocated to another branch. *See State ex rel. Decker v. Montague*, 195 Minn. 278, 262 N.W. 684, 689 (1935). Critically, in *State ex rel. Birkeland v. Christianson*, we said the following:

> The Governor is the head of the executive department and the chief executive of the state. The three departments of state government, the legislative, executive, and judicial, are independent of each other. Neither department can control, coerce, or restrain the action or nonaction of either of the others in the exercise of any official power or duty conferred by the Constitution, or by valid law, involving the exercise of discre-

tion. The Legislature cannot change our constitutional form of government by enacting laws which would destroy the independence of either department or permit one of the departments to coerce or control another department in the exercise of its constitutional powers.

179 Minn. 337, 229 N.W. 313, 314 (1930).

As to the line-item veto, on at least three occasions we have stressed that this power, although assigned to the Executive, must be narrowly construed "so as not to exceed its limited function as contemplated by the constitution." *Johnson v. Carlson*, 507 N.W.2d 232, 233 (Minn. 1993); *see Brayton v. Pawlenty*, 781 N.W.2d 357, 366 (Minn. 2010) (noting that the line-item veto power "must be construed narrowly to prevent usurpation of the Legislature's proper authority"); *Inter Faculty Org. v. Carlson*, 478 N.W.2d 192, 194 (Minn. 1991) (explaining that as an exception to the power to legislate, the line-item veto cannot be construed to allow the Executive to use it in a way that usurps the authority of the Legislature); *see also In re Application of the Senate*, 10 Minn. 78, 81 (1865) (explaining that the duty of each branch is to "abstain from and to oppose encroachments on either" (quoting *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 n.(a), 1 L.Ed. 436 (1792))).[7]

I turn next to the analysis of why the Governor's post-session line-item vetoes of the legislative appropriations are unconstitutional.

The Governor argues that his line-item veto power is unqualified and unlimited and includes the authority to eliminate all

---

**7.** The line-item veto originated in the Constitution of the Confederate States of America and was designed to curb legislative riders that had become common in the era before the Civil War. *See* Staff of H. Comm. on Rules, 99th Cong., *Item Veto: State Experience and Its Application to the Federal Situation 3*,

6–7 (Comm. Print 1986) (citing Constitution of the Confederate States of America, Art. I, § 7. Reproduced in Henry Steele Commager, ed., *Documents of American History* 378 (1973)). Minnesota was an early adopter of the line-item veto, adding it to the state's constitution in 1876. *Id.* at 201.

appropriations for the Legislature, a position that King James I might have found familiar. The Governor's only concession in our court is to explain that an unconstitutional abolition of the Legislature could be remedied by a judicial order that authorizes "core funding," an option that has been dubious at best and that is now foreclosed.

The district court concluded that the Legislature was effectively abolished by the Governor's line-item vetoes. I agree. The facts necessary to support that conclusion are undisputed. The biennial appropriations for the Legislature were eliminated by the Governor's vetoes, and the Legislature could not use its constitutional authority to override those vetoes because the session had ended. On the basis of these undisputed facts, and based on the stipulations of the parties, the district court concluded that the Legislature would be out of funds within a matter of weeks (for the Senate) and at most a few months (for the House). The court reaches a slightly different conclusion by pushing the legislative bankruptcy date to sometime after the commencement of the 2018 legislative session.

These discussions about what loose change can be found and when it can be spent to keep the Legislature operating are interesting but ultimately irrelevant.

To inquire beyond the amount of the now-vetoed legislative appropriations creates its own separation-of-power concerns. How the Legislature spends its operating funds is of no concern to the Judiciary or to the dispute. Although I recognize that the court has been careful to limit its conclusion to carryover funds and some portion of the unencumbered funds available to the Legislative Coordinating Commission, it is apparent that those monies were appropriated for other reasons. It also bears mention that the only reason

anyone is looking at the entirely separate, un-vetoed, appropriations to the Legislative Coordinating Commission is because the Governor's line-item vetoes left the Legislature without any appropriations for the 2018–2019 biennium. Accounting shifts and balance calculations by the Judicial Branch are neither necessary nor appropriate.

The abolition of an entire branch of government by financial impoverishment is a serious matter, one that we warned against over 40 years ago. In *In re Clerk of Court's Compensation for Lyon County v. Lyon County Commissioners*, addressing concerns over possible legislative overreach that would create separation-of-powers issues affecting the Judiciary, we observed that:

> Obviously, the legislature could seriously hamper the court's power to hear and decide cases or even effectively abolish the court itself through its exercise of financial and regulatory authority. If the court has no means of protecting itself from unreasonable and intrusive assertions of such authority, the separation of powers becomes a myth.

308 Minn. 172, 241 N.W.2d 781, 784 (1976). Those principles apply to the present controversy as well. I would therefore conclude that the Governor's post-session line-item vetoes of the entire appropriations for the Legislature effectively abolished an independent branch of our government and therefore violated Article III of the Minnesota Constitution.

Setting aside the question of how long the Legislature can survive on savings, the Governor's line-item vetoes are unconstitutional for an additional reason. I would also conclude that the Governor's line-item vetoes were unconstitutionally coercive in violation of Article III and void on that ground as well. We have stated clearly that one branch of government may not

coerce another branch in the exercise of its constitutional powers. *Birkeland,* 229 N.W. at 314. The legislative scrum as issues are debated, sometimes with great heat, and the give and take between the Legislative and Executive Branches as those issues are sorted through, frequently involve some element of coercion. Threats to take one course of action to force some other course of action are not uncommon. But the circumstances in which the Governor used his constitutional power are very different from those historic and well-understood practices.[8]

Here, the Governor cancelled every dime appropriated to operate a co-equal branch of government that is established by Article IV of our constitution. Then, the Governor told the Legislature to accede to his demands or remain financially unable to fulfill the powers conferred on the Legislature by our constitution. There are coercive actions that are unclear, where perhaps judicial restraint would be appropriate, where the "pearl of great price"[9] is something other than the continuation of one of three co-equal departments of the government. Those are not the actions we now consider. The Governor's message was neither tentative nor unclear; he offered the Legislature two choices, neither of which has any foundation in the powers conferred on the Executive Branch by the constitution.[10] We need not set out a rule for all time as to when a veto is unconstitutional because of coercion. It is enough to state based simply on the Governor's words that his exercise of the line-item veto power was unconstitutionally coercive.

The Governor's response to the claim of coercion is to point to our decisions that suggest that we do not examine the motives of actors in the co-equal departments of government. *See Johnson,* 507 N.W.2d at 234–35 (declining to consider policy reasons listed in the veto message when holding that the Governor validly line-item vetoed an "item of appropriation"); *Inter Faculty Org.,* 478 N.W.2d at 197 (finding line-item veto textually invalid and not considering education policy disagreements that explicitly motivated the veto); *Starkweather v. Blair,* 245 Minn. 371, 71 N.W.2d 869, 875–76 (1955) (explaining that the motives of the Legislature in passing legislation are beyond judicial inquiry when the Legislature has not exceeded its constitutional authority). But these cases simply do not apply to the conflict here. Unlike these earlier cases, where determining the underlying political calculations—the motive, if you will—would require judicial investigation or speculation, the Governor's demands are clear, unambiguous, and lack any equivocation. By avoiding inquiry into "motive" in these earlier cases, the court declined to search among or beyond explicit policy reasons to find and evaluate some unstated, presumably unconstitutional, agenda. These cases simply do not apply here, where otherwise textually valid line-item vetoes were used to achieve an unconstitutional result—to coerce another branch of government. In other words, here the Governor used "a

---

**8.** The Governor claims, with some justification, that the unprecedented actions of the Legislature occurring during the legislative session, including a "poison pill" to defund the Department of Revenue, were coercive and at least part of the reason for the events that followed. As the court correctly notes, that issue is not before us.

**9.** *Matthew* 13:46.

**10.** "I am line-item vetoing the appropriations for the Senate and House of Representatives to bring the Leaders back to the table to negotiate provisions in the Tax, Education and Public Safety bills that I cannot accept." Letter from Mark Dayton, Governor, State of Minn., to Michelle L. Fischbach, President of the Senate, State of Minn. (May 30, 2017).

constitutional power to accomplish an unconstitutional result." *Starkweather*, 71 N.W.2d at 876. *Starkweather, Inter Faculty Organization*, and *Johnson*, all dealing with routine disputes between the Executive and Legislative Branches, do not stand for the proposition that we must avert our eyes in the face of a claimed right by one branch of government to pressure another branch of government to acquiesce or face obliteration. Indeed, to do so effectively ignores our repeated admonition that we construe the Governor's line-item veto power "narrowly." *Johnson*, 507 N.W.2d at 233.

### IV.

Article III of the Minnesota Constitution establishes three co-equal branches of government. The exercise of the line-item veto power over the legislative appropriations for the Minnesota Senate and the Minnesota House of Representatives, following legislative adjournment, alters the balance of powers by elevating the powers of the Governor. Because this result creates three *unequal* branches of government, I would hold that the line-item vetoes of legislative appropriations are unconstitutional as a violation of the Separation of Powers required by Article III of the Minnesota Constitution. I, therefore, would affirm the district court.

An unconstitutional veto is "null and void and without legal effect." *Inter Faculty Org.*, 478 N.W.2d at 197. Because the Governor's line-item vetoes violate the Separation of Powers required by Article III of the Minnesota Constitution, I would declare those vetoes null and void and restore the legislative appropriations.

For the foregoing reasons, I respectfully dissent.